UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

IN RE:                                          Chapter 11

PETER G. BALLAS, II,                            Bankruptcy No. 09-12545-EPK

Debtor.

## THIRD AMENDED [PROPOSED] DISCLOSURE STATEMENT

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

### I. INTRODUCTION

1. Peter G. Ballas, II, the Debtor, provides this Disclosure Statement to all of the Debtor's known creditors in order to disclose that information deemed by him to be material, important and necessary for the creditors to arrive at a reasonable informed decision in exercising their right to vote for acceptance of the First Amended Plan of Reorganization (hereinafter the "Plan"), filed by him with the Bankruptcy Court. A copy of the Plan accompanies this Statement. The original Plan was modified primarily to reflect a change in the treatment of tax claims, which has been agreed to by the IRS. Debtor has now filed all required income tax returns.

2. The United States Bankruptcy Code provides, as a general rule, that in order for a Plan of Reorganization to be deemed accepted, each class of the claims must accept the Plan. A class of creditors whose rights are impaired and altered under the Plan is deemed to have accepted the Plan if two-thirds in dollar amount and one-half in number of those creditors in that class holding allowed claims who cast votes vote in favor of the Plan.

3. A class of claims which is not affected under the Plan is deemed to have accepted the Plan and need not vote.

4. In the event the Plan is not accepted by at least two-thirds in dollar amount and more than one-half in number of the creditors of any impaired class, Debtor, under §1129(b) of the Bankruptcy Code, may request the Court to confirm the Plan anyway. The Court, in such a case, will confirm the Plan if all requirements for confirmation set forth in the Bankruptcy Code except acceptance by one or more classes of creditors are met and the Court finds the Plan to be "fair and equitable" to the nonaccepting classes. If the Plan is not accepted by all classes, the Debtor might be liquidated under Chapter 7 of the Bankruptcy Code. In that event, the Debtor's assets would be liquidated and distributed to the creditors in accordance with their statutory priority after the payment of all costs of administration.

5. The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances will be borne by the Debtor. In addition, the Debtor has retained the services of the law firm of Reizes Law Firm, Chartered in connection with the preparation of the Plan. However, fees for legal services are payable only upon approval by the Bankruptcy Court after Notice of Hearing is given to all creditors and other interested parties.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO HIS FUTURE INCOME OR VALUE OF HIS PROPERTY ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR AND THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

2

## II. BACKGROUND

6. The Debtor herein, Peter G. Ballas, II, resides in Gulf Stream, Palm Beach County, Florida. The Debtor is engaged in the practice of medicine as an employee and the owner of Peter G. Ballas II M.D., P.A., which has its offices in Boca Raton, Palm Beach County, Florida. A copy of his curriculum vitae is attached as Exhibit "A."

### Events Leading to Chapter 11 Filing

7. The Debtor's economic problems are, in the main, the result of the economic downturn which reduced demand for dermatological surgery and other procedures and cosmetic treatment, the downturn in property values in Florida and Utah, prohibiting refinancing, and disputes and litigation concerning trusts of which he is a beneficiary, causing delays in distribution. These factors led to his filing the petition. A distribution from his father's now irrevocable trust is expected to follow a favorable result of an appeal in the Ohio Intermediate Appellate Court which was not appealed to the Ohio Supreme Court, but the trust is irrevocable since his death and contains spendthrift provisions which means that trust assets are not available to creditors. A copy of the trust agreement is annexed as Exhibit "B." Debtor's position it that neither the trust corpus nor any income thereof nor distributions therefrom are property of the estate. The trust was settled by Debtor's father. Under Article 9, paragraph 1 thereof, it is governed by Ohio law. Article 5 thereof contains the spendthrift provisions. Such provisions are governed in bankruptcy by state law. Eaton v. Boston Trust Co., 240 U.S. 427 (1916). Under Ohio law, spendthrift provisions are valid and the debtor's expectancy from the trust does not become property of the estate. In re Ely, 331 B.R. 353 (Bankr. N.D. Ohio 2005); In re Jamison, case no. 01-32607, adv. proc. no. 02-3133 (E.D. Tenn. 2002). Accordingly, Debtor's interest in the trust or distribution therefrom should not be considered by creditors in evaluating the Plan.

### Significant Events During the Bankruptcy Case

8. The Debtor submitted an application to employ Leslie N. Reizes, Reizes Law Firm, Chartered as attorney to represent him in this case. Application was made to employ John J. Matteis, CPA of the firm Matteis & Christopher, P.A. as accountant. Applications were also

3

submitted to employ Barbara Whittaker/ The Corcoran Group as Florida real estate broker and Chris Eberlein/ Keller Williams Park City Real Estate as Utah real estate broker. All of these applications were approved by the Court.

9. An adversary proceeding was filed when the Trustee under the deed of trust of the Utah property, despite notice of the Chapter 11 filing, advised it would proceed with foreclosure. A motion for a preliminary injunction was resolved by submission of an agreed order enjoining defendants from proceeding with foreclosure until further order of the Court.

10. Since that time, the various firms representing Wells Fargo, have been replaced by Carlton Fields, which firm has been constantly apprised of the efforts to market the property subject of the Wells Fargo liens. The adversary is now on hold because the secured lender is not proceeding in violation of the automatic stay and in fact is cooperating with Debtor's efforts to sell the properties realizing that they will bring more at a private sale than at a foreclosure auction.

11. Key Bank, as a secured creditor, filed a motion to lift the stay on assets it was holding and liquidated the assets. It now has a disputed claim for a small balance. Neither the lifted stay nor the adversary proceeding is material to Debtor's prospects for successful reorganization.

12. Since filing his Chapter 11 petition, Debtor has made substantial efforts to economize the medical practice of his professional association and has been successful in bringing down his overhead. Particular efforts have been concentrated in reducing payroll and rent expense. Payroll has been reduced by 40%, rent has been negotiated downward, but the income of the practice is down by 50%.

13. None of the trust litigation or the litigation with Wells Fargo is material to the feasibility of reorganization, unless Debtor and his sisters are successful in their case, and the trustee makes a distribution to the Debtor, which would be expected to be about $800,000. There is no guaranty of the ultimate success of the litigation, and even if successful whether a distribution to Debtor will be made. In any event such distribution would not, in Debtor's opinion, be property of the estate.

14. It is impossible to predict the exact payments required to fund the Plan because of

4

the undetermined tax claims. Nevertheless, Debtor projects gross income of $16,000.00 per month, increasing at 5% per annum. The most recent monthly operating report is annexed as Exhibit"C." These forecasts are substantiated by the monthly operating reports. The 2008 cash operating income of Dr. Ballas was $225,000.00.

15. Debtor sold his Utah residence on February 22, 2010, which resulted in the payoff of the first, second, and third liens, all in accordance with an order of this Court under Code § 363. Debtor believes that a successful reorganization depends in great measure on the sale of his Florida residence. This property is currently listed for sale with a Court-appointed broker at a price of $1,500,000.00. When this property is sold there should be adequate funds to pre-pay all the plan payments except those relating to the Chicago property. However, unless the real estate is sold, the plan payments cannot be made. For the foregoing reasons, the Debtor believes that he is capable of future operations on a profitable basis which operations will be sufficient to enable him to make the payments proposed under his Plan of Reorganization.

## III. THE PLAN OF REORGANIZATION

16. The Plan provides for the division of the claims of the creditors and interest holders herein into eleven separate and distinct classes. Class I and Class II creditors are tax creditors. As to Class I creditors, allowed, secured claims shall be paid pro rata to the extent of the value of the underlying real estate pursuant to 11 U.S.C. § 502(b)(3) with interest at the applicable statutory rate as of the effective date in monthly fixed installments over 60 months. Secured non-priority tax creditors will be paid when the properties as to which they relate are sold.

17. The Plan provides for other general secured creditors as to those properties being retained, to be paid in full by paying equal installments of principal amortized over 20 years with interest at the prime rate plus one percentage point as of the effective date. General unsecured creditors will be paid five percent of their allowed claims over ten years, in equal annual installments without interest.

18. Debts incurred after the filing of the petition by the Debtors under Chapter 11 and during the pendency of the reorganization proceeding shall be entitled to priority of payment over

5

pre-existing debts. The Court shall retain jurisdiction to see that the terms of the Plan are carried out and to pass upon, hear and determine all claims against the Debtor. The Debtor will be entitled to modify the terms of the Plan, subject to Court approval, but without prior notice to creditors and interest holders provided the terms of the amendment are as at least as favorable to the creditors and interest holders as the original Plan. Priority claims, including income tax claims are now estimated to total approximately $202,000.00. To the extent there are insufficient funds to pay attorneys fees at confirmation, Debtor's counsel has agreed to accept post confirmation installment payments. The post petition debt consists of administrative claims, being attorneys fees, accountant fees and real estate taxes. The Debtor has not borrowed any sums requiring court approval.

19. Specifically, the proposed Plan provides as follows:

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

Claims against the Debtor and Interests in the Debtor are hereby classified as follows:

A. Class I shall consist of creditors who have tax claims secured by real property.

B. Class II shall consist of creditors who have priority unsecured tax claims.

C. Class III shall consist of the creditor holding a first mortgage lien on the premises owned by Debtor situate at 159 East Walton Place #12D, Chicago, IL 60611, which is believed by Debtor to be Wells Fargo, with a claim in the amount of $686,000.00.

D. Class IV shall consist of the creditors holding a first mortgage lien on the premises owned by Debtor situate at 49 Silver Dollar Drive, Park City, Utah, which is believed by Debtor to be Wells Fargo Home Mortgage, with a claim in the amount of $1,220,222.00 which has been paid.

E. Class V shall consist of the creditor holding a first mortgage lien on the premises owned by Debtor situate at 3960 North Ocean Blvd, # 1, Gulf Stream, FL 33483 which is believed by the Debtor to be Wells Fargo Home Mortgage with a claim in the amount of $1,000,000.00.

6

F. Class VI shall consist of the creditor holding a second mortgage lien on the premises owned by Debtor situate at 159 East Walton Place #12D, Chicago, IL 60611, which is believed to be Wells Fargo Bank, N.A., with a claim in the amount of $94,509.23.

G. Class VII shall consist of the creditor holding a second mortgage lien on the premises owned by Debtor situate at 49 Silver Dollar Drive, Park City, Utah, which is believed to be Wells Fargo Bank, N.A., with a claim in the amount of $1,117,712.85 which has been paid.

H. Class VIII shall consist of the of creditor holding a second mortgage lien on the premises owned by Debtor situate at 3960 North Ocean Blvd., #1, Gulf Stream, FL 33483, which is believed by the Debtor to be Wells Fargo Bank, N.A. with a claim in the amount of $279,989.92.

I. Class IX shall consist of all other secured claims.

J. Class X shall consist of the creditors having unsecured claims. Included in this class are unsecured deficiency claims of creditors asserting secured claims.

K. Class XI shall consist of the Interests of the Debtor.

## ARTICLE IV

### TREATMENT OF CLAIMS NOT IMPAIRED UNDER THE PLAN

20. Class IX, the Debtor, shall retain his interests without alteration; they are not impaired by the Plan.

## ARTICLE V

### TREATMENT OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN

21. Classes I through X are impaired within the meaning of Bankruptcy Code § 1124 and shall be treated as follows:

A    Class I and II Creditors, the taxing authorities, will be paid in full, pro-rata, but to a maximum amount as to each property of the Debtor, of the value of the properties secured by their liens, or subject of their priority unsecured claims, as hereinafter set forth without penalties but with interest at the statutory rate as at the effective date, for the post confirmation period in

7

equal monthly installments for 60 months, as to those properties being retained. All in personam claims against Debtor are extinguished. Debtor shall be credited with any post-petition payments on account of tax.

B.     Classes III through IX claims will be recast into 20 year mortgages with equal monthly payments of principal and interest at the prime rate plus one percentage point as at the effective date for the entire fixed term of the recast mortgages, with the first payment commencing 30 days after the effective date.

THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED ON FOR VOTING PURPOSES. CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE PLAN IN FULL AND TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN. THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

IV. BENEFITS OF THE PLAN OVER LIQUIDATION

22.     The Plan is based upon the Debtor's belief that the present forced liquidation value of the Debtor's assets would be sufficient only to pay secured claims of the taxing authorities without payment in full to the secured creditors of their full mortgage debts because of the present real estate market for South Florida homes and the resort second homes in Utah. The valuations of the real estate as set forth in the liquidation analysis are based on debtor's real estate brokers' opinions. The medical practice is heavily indebted and would have no value to anyone other than the debtor. Accordingly, a forced liquidation through a Chapter 7 bankruptcy liquidation proceeding, or otherwise, would, in the Debtor's opinion, result in no recovery by unsecured creditors. The intent of the Plan is to enable the Debtor to continue his medical practice thereby, hopefully, generating sufficient additional moneys to make payments to creditors which could not be made through liquidation of the Debtor's assets.

8

23. Included herein is a liquidation balance sheet showing the Debtor's best estimation of what could be recovered upon the Debtor's assets in liquidation and what the resulting effect on creditors would be. As is apparent, unsecured creditors would receive nothing on liquidation. A recovery by unsecured creditors can be achieved only through the Debtor's continued operations under a confirmed Plan. The Debtor's liquidation analysis is based on discounting his accountant's compilation of assets and liabilities and the projections of income from his practice, all as set forth in composite Exhibit "E."

V. FUNDING OF PLAN

24. The Debtor intends to fund his Plan of Reorganization from the continued operation of his medical practice, and the sale of the Gulf Stream, Florida, and Park City, Utah properties the latter of which has now been accomplished. The Court has approved the retention of a real estate broker to market the Florida property.

VI. FINANCIAL INFORMATION

25. Debtor's operating statements since filing are current and on file with the Court. In Debtor's opinion, the operating reports fairly and accurately represent the condition of the Debtor as of January 31, 2010, and do not substantially differ from the situation as of the filing date except that his income is down as a result of the South Florida economy and health issues of the Debtor. Debtor is aware of no other material change which would significantly affect the information contained on the said statements as of the present date.

26. Here follows a liquidation balance sheet which reflects the Debtor's best estimate as to the amount recoverable from the Debtor's assets on liquidation and the application of the liquidation proceeds to indebtedness of the Debtor:

| Property | Value |
|---|---|
| Real Estate @ 70% of scheduled values | $4,409,300.00 |
| Personal Property at liquidation | 100,000.00 |
| TOTAL REALIZED AT LIQUIDATION | $4,509,300.00 |

9

| SECURED AND PRIORITY TAX CLAIMS | 230,000.00 |
| MORTGAGE CLAIMS | 5,208,655.00 |
| ADMINISTRATIVE CLAIMS | 100,000.00 |
| NEGATIVE BALANCE AVAILABLE FOR GENERAL UNSECURED CLAIMS | ($1,029,355.00) |

27.   Projected income is expected to make the Plan feasible because the Debtor expects his income to continue and to be devoted to plan payments.

VII.   CONSIDERATIONS RELATING TO CONFIRMATION OF PLAN

28.   In order for the proposed Plan to be confirmed by the Court, it will be necessary for the Debtor, as the Plan's proponent, to solicit acceptances of the Plan from the members of the various classes of Claimants whose Claims have been impaired.   Court approval of this Disclosure Statement is required prior to the Debtor's solicitation of acceptances (Section 1123(b) of the Code).

29.   All non-administrative, unsecured and non-priority Claimants are impaired by the terms of the Plan, and it will, therefore, be necessary to solicit and obtain acceptances from such claimants.

30.   Under Section 1126(c) of the Code, a class of claims has accepted a Plan if such plan has been accepted by Creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class held by Creditors that had accepted or rejected such Plan. There is, of course, a good faith requirement. Section 1126(e) of the Code permits the Court, upon request and after notice and a hearing, to designate any entity whose acceptance or rejection was not in good faith or was not solicited or procured in good faith. Entities which are found to have accepted or rejected a Plan not in good faith are excluded in the computation of votes required under the Bankruptcy Code.

31.   If acceptance of the Plan cannot be obtained, it may be necessary for the Debtor or for the Creditors or any other interested party to propose a new Plan, which Plan may be a liquidation rather than a reorganization plan.

32.   Other interested parties may also file competing plans.

10

33. The amount of claims are set forth in the claims register incorporated by reference. The bar date for filing proofs of claim has passed. The Debtor intends to object to claims No. 1, 2, 10, 11, 12, 14, 15, 16, 18, and 19.

34. It is estimated administrative claims will be $100,000.00.

35. Section 1141 of the Bankruptcy code describes the effect of confirmation of the Plan. When the Plan is confirmed the provisions are binding on the entities listed in section 1141(a), property vests in the debtor free of claims and interests. Unless after notice and a hearing the Court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan.

36. Unless the real estate is sold, unsecured creditors will realize nothing. The real estate lenders are now fully secured, their risk is a further deterioration in the real estate markets.

37. Under Code § 1125 (a)(1) adequate information in a disclosure statement requires consideration of the complexity of the case and the information required by a hypothetical investor in the concerned class. Here nearly all of the debt is held by Wells Fargo, one of the nation's largest financial institutions, which is certainly familiar with the three properties subject of the case, and sophisticated enough to analyze the plan with the information disclosed. The other secured creditor is equally sophisticated.

38. Upon information and belief, there are no secured non-priority tax creditors. All real estate property taxes are paid to date.

39. As detailed in the First Amended Plan of Reorganization, Class X consists of the creditors having unsecured claims. Included in this class are unsecured deficiency claims of creditors asserting secured claims.

40. Exhibit "E" is based on the accountant's assumption of 100% recovery whereas the liquidation analysis in the body of the Disclosure Statement assumed 70% of the scheduled values because of the current state of the real estate market and the continuing accrual of interest and expenses.

41. The valuation of Debtor's assets as listed on Schedule B is based on Debtor's

11

opinion.

42. Debtor's medical practice has not achieved its aims since filing of the petition but Debtor is optimistic that over time these goals will be reached. None of his personal expenses is being paid by the business.

43. The trade debt of the medical practice which was guaranteed by Debtor is treated as part of Class X because Debtor is responsible for the debt he guaranteed.

44. The Debtor is developing evidence to support his claims objections and will make the objections when the information is fully developed.

45. The real estate subject of the Plan is owned by Debtor as trustee of a revocable trust, of which he is the grantor and initial beneficiary. The trust corpus and any distributions are property of the estate.

46. The Utah property was sold sale free and clear of liens on February 22, 2010, for $3,050,000.00. The Gulf Stream, Florida, property is listed for sale with Barbara Whittaker of The Corcoran Group as disclosed in the application to employ her as Real Estate Broker. The property continues to be shown. Debtor plans to retain his Chicago residence.

47. Debtor has not been paid what he expected from his medical practice as receipts are down because the demand for cosmetic and other elective medical procedures has been reduced by current economic conditions. Additionally, during recent months he was undergoing medical evaluation and treatment that required a reduction in his work hours.

48. This Disclosure Statement contains the Debtor's best estimate of repayment potential. Any evidentiary issues are for a confirmation hearing.

49. The Bankruptcy Code provides for payment of the U.S. Trustee's fees until the case is closed.

50. The Debtor has made his best estimate as to future income but in these uncertain times cannot offer more that his best estimate which is that the secured creditors will be paid in full under the plan and the unsecured creditors will be paid something under the plan, if confirmed,

and nothing if the case is dismissed or converted.

## VIII. CONCLUSION

51. The foregoing represents what the Debtor believes to be a fair and accurate representation of the general terms of the proposed Plan of Reorganization and the Debtor's current financial condition. ALL CREDITORS ARE CAUTIONED THAT THE ABILITY OF THE DEBTOR TO PERFORM HIS OBLIGATIONS UNDER THE PLAN OF REORGANIZATION IS UNCERTAIN AND, ACCORDINGLY, THERE CAN BE NO ASSURANCE GIVEN THAT ALL OF THE PAYMENTS PROPOSED TO BE MADE WILL IN FACT BE MADE BY THE DEBTOR. Nonetheless, Debtor believes that the proposed Plan of Reorganization offers the best chance of recovery by all classes of creditors in this case and that, accordingly, it would be in the interest of all classes of creditors to vote in favor of the proposed Plan.

Dated: Boynton Beach, FL
February 26, 2010

*/s/ Peter G. Ballas, II*
Peter G. Ballas, II

### REIZES LAW FIRM CHARTERED

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and that I am in compliance with the additional qualifications to practice set forth in L.R. 9010 (D) (1) and (2).

By: */s/ Leslie N. Reizes*
Leslie N. Reizes
Attorneys for Debtors
1200 South Federal Highway, Suite 301
Boynton, Beach, FL 33435
Tel: (561) 736-2600
Fax: (561) 736-2700

13

# CURRICULUM VITAE
# PETER G. BALLAS II, M.D.

1905 Clint Moore Road, Suite 215
Boca Raton, FL 33496
561-989-9002

## EDUCATION

| | | |
|---|---|---|
| 1969-1971 | ALBION COLLEGE – Albion, MI | |
| 1974-1976 | UNIVERSITY OF MICHIGAN – Ann Arbor, MI | B.S. Degree |
| 1977-1980 | MEDICAL COLLEGE OF OHIO | M.D. Degree |

## GRADUATE TRAINING

| | | |
|---|---|---|
| 1981-1982 | MERCY HOSPITAL – Toledo, OH | Flexible Internship |
| 1982-1985 | HENRY FORD HOSPITAL – Detroit, MI | Residency in |
| | | Dermatology & |
| | | Dermatologic Surgery |

## LICENSURE – CERTIFICATION

| 1983 | Diplomat – Federation Licensing Examination | |
|---|---|---|
| 1983 | Michigan State Medical Licensure | #4301046550 |
| 1985 | Board Qualified/Eligible Dermatology & Dermatologic Surgery | |
| 1985 | Florida State Medical Licensure | #ME 0046838 |
| 1986 | Ohio State Medical Licensure | #35-05-3502 |
| 2007 | Utah State Medical | #5464145-1205 / #5464145-8905 |
| 2008 | State of Illinois | #036.116911 |

## POSITIONS – APPOINTMENTS

Sterling Heights Clinic; HFH Dermatology – Acting Junior Staff Member
HENRY FORD HOSPITAL – Sterling Heights, MI
May 1984

Sandalwood Association Board of Directors – Bloomfield Hills, MI
1985

Palm Beach County Medical Society – Public Relations Committee – Palm Beach, FL
1988-1989

Eclipse Labs Dermatology Consultant for Eclipse Sunscreens – Boca Raton, FL
1989

Chairman, Department of Dermatology – A.M.E.R.I.C.A. Charitable Fund – Boca Raton, FL
1993-1994

Physicians Advisory Committee – Dermatology Partners, Inc. – Tampa, FL
1998 – 2000

Trustee and Director – George P. Ballas Foundation – Toledo, OH
1989 – present

Deerlake Village Board of Directors – Park City, UT

1 | Page

EXHIBIT
A

2002 – Present

Board of Trustees. Chatham Hall School – Chatham,VA
2003 –2006

## ADJUNCT TRAINING

Punch Grafting, Mini and Micrografting Hair Replacement with $CO_2$ Pulse Laser
Brodie M. James, M.D.
James Clinic, Camden, ME
December 1994

Incisional Slit Grafting, Mini and Micrografting Hair Replacement Techniques
Isabel M. Banuchi, M.D.
San Juan, Puerto Rico
December 1994

Medlite Nd Yag laser
Delray Beach, Fl
May 1996

Laserscope Aura with Starpulse – Facial Telangiectasias and Leg Varicosities
Oscar Hevia M.D.
Fort Lauderdale, FL
November 1996

Softform Facial Implants
Dr. Ballas was trained and conducted other training courses for Plastic Surgeons and
Dermatologists.
Collagen Corporation
Palo Alto, CA
June 1997

Botulinum Toxin A – Deep Creases and Wrinkles – Advanced Training
Allergan Corporation
Irvine, CA
June 1997

Dermalogen Tissue Matrix – Advanced training by developer
Melvin Elson, M.D.
Nashville, TN
August 1999

Lyra Laser for Telangiectasias and Leg Varicosities
Boca Raton, FL
October 2002

Candela V Beam Laser
Boca Raton, FL
October 2003

Ballas II, P. G.
>NEW PRODUCT FOR PSORIASIS – THE SCHOCH LETTER, Vol. 47, No. 2 –
>February 1997

## PRESENTATIONS

Ballas II, P. G., McGoey, J. W.
>UNILATERAL NEVOID TELANGIECTASIA IN AN INFANT
>American Academy of Dermatology 42nd Annual Meeting – Chicago, IL - 1983

Ballas II, P. G., Nordby, C. A.
>VESICULO-BULLOUS LUPUS ERYTHEMATOSUS
>American Academy of Dermatology 43rd Annual Meeting – Washington, D.C. - 1984

Ballas II, P. G., Mitchell, A. J.
>EXTRAMEDULLARY HEMATOPOESIS (accepted for presentation)
>Michigan Dermatological Society – Detroit, MI – April 1985

Ballas II, P. G.
>PRE-MALIGNANT AND MALIGNANT SKIN LESIONS
>Vero Beach Public Library Lecture Series – March 1986

Ballas II, P. G.
>PRE-MALIGNANT AND MALIGNANT SKIN LESIONS
>Highland Beach Public Library Lecture Series – February 1987

Ballas II, P.G.
>ARTEFILL LECTURE AND PRESENTATION
>Palm Beach County Plastic Surgery Society – April 2008

## RESEARCH

Ballas II, P. G., Burnham, J. C., Burkhardt, C.
>THE EFFECTS OF BENZOIL PEROXIDE ON P. ACNES USING THE SCANNING
>ELECTRON MICROSCOPE – Medical College of Ohio – Toledo, OH
>January 1981 – June 1981

## HOSPITAL APPOINTMENTS

DELRAY BEACH MEDICAL CENTER   Courtesy Staff
Delray Beach, FL
May 1987 – Present

BOCA RATON COMMUNITY HOSPITAL   Active Staff
Boca Raton, FL
December 1991 – Present

## PRACTICE EXPERIENCE

Associated with Jerry R. Kramer, M.D.                          August 1985 – March 1986
Vero Beach, FL

Associated with John B. Squires, M.D. &                       April 1986 – December 1986
Jeffrey Mahon, M.D. during relocation and
Set-up of my private practice
Boca Raton/Delray Beach, FL

Private Practice                                              January 1987 – Present
Boca Raton/Delray Beach, FL

## MALPRACTICE INSURANCE

Florida Physicians Insurance Company
Policy 37265
Limits $1,000.000/$3,000,000
Effective through July 13, 2009

## DATE OF BIRTH

February 15, 1951

## MARITAL STATUS

Single, One Daughter

## GEORGE P. BALLAS
## AMENDED TRUST AGREEMENT

Grantor:        **GEORGE P. BALLAS**

Trustee:        **GEORGE P. BALLAS**

Trust Name:     **GEORGE P. BALLAS AMENDED TRUST**

Date:           August 1, 1997

Grantor and Trustee executed an Amended Trust Agreement on. November 4, 1996, in which Grantor reserved the power to amend any of the Trust Agreement's terms.

Grantor and Trustee agree that the Trust Agreement is hereby amended in its entirety and that the trust property shall be held, managed, and distributed as provided in this Agreement.

### ARTICLE 1

#### DEFINITIONS

1.    Grantor's spouse is **MARIANNE BALLAS** ("Grantor's Spouse").

2.    The term "child", "children", "issue", and any similar term shall include any child of Grantor, or issue thereof, now living or hereafter born, and shall include any child adopted, now or in the future, by Grantor or any of Grantor's issue. A person born out of wedlock and those claiming through that person shall be deemed to be issue of the natural mother and her ancestors, unless a decree of adoption terminates the rights of the natural mother, and shall not be deemed to be the issue of the natural father and his ancestors.

Grantor presently has three (3) children, namely, **MATINA A. NIMPHIE, STEFANI BALLAS DELAVILLE** and **PETER G. BALLAS, II.**

### ARTICLE 2

#### ADDITIONS TO TRUST

1.    Trustee, at any time, may accept additions of property from Grantor, or any other person, to be held and administered in accordance with the terms of this Agreement.

2.    Receipt by Trustee for any property added to the trust, including any insurance proceeds payable to the trust, shall be a

EXHIBIT

B

complete acquittance and discharge to the extent specified in Trustee's receipt. No person who makes an addition to the trust, nor any insurance company which makes any payment to Trustee, shall be permitted to see to the fulfillment of any trust herein established.

## ARTICLE 3

### RIGHTS RESERVED BY GRANTOR

Grantor shall have the power at any time, upon written notice delivered to Trustee, to withdraw any portion or all of the trust property, to revoke, in whole or in part, this Agreement, or to alter any of its terms, except that Grantor shall have no power to change the powers or obligations of Trustee set forth in the Articles entitled "Powers of Trustee" and "As to Trustee" without the written consent of Trustee. Before Trustee shall be required to deliver or surrender trust property to or upon the order of Grantor, Trustee, upon written notice delivered to Grantor, shall be paid its compensation and shall be reimbursed for any advances, loans, or expenses incurred by it.

## ARTICLE 4

### BENEFICIARIES

1. **During Grantor's Life.** During the lifetime of Grantor, Trustee shall pay to or apply for the benefit of Grantor or Grantor's Spouse such amounts of income or principal, or both, as Trustee deems to be necessary, advisable, or expedient for the best interests of Grantor, and for the health, education, support, or maintenance of Grantor's Spouse. Undistributed income shall be accumulated and added to principal.

2. **Payment of Bequests in Grantor's Will.** After the death of Grantor, if Grantor's probate estate is insufficient to satisfy any specific monetary bequests contained in Grantor's Last Will and Testament, Trustee shall pay such monetary bequests directly to the legatees entitled thereto. In addition, if this trust, on the date of Grantor's death, contains specific property with which to satisfy bequests or devises of specific tangible, intangible, or real property contained in Grantor's Last Will and Testament, but which specific bequests and devises cannot be satisfied from Grantor's probate estate, Trustee shall distribute such specific tangible, intangible, or real property to the legatees or devisees entitled thereto.

3. **Trust for Grantor's Mother, Irene P. Ballas.** If Grantor's mother, **IRENE P. BALLAS** survives Grantor, Trustee shall allocate to and hold in a separate trust ("Trust C") for the sole

2

use and benefit of **IRENE P. BALLAS** ("Irene"), three hundred thousand dollars ($300,000) and the real property located at 4227 Talmadge Woods, Toledo, Ohio, as more fully described on Exhibit A, attached hereto and made a part hereof. Trust C shall be administered and distributed as follows:

> 3.1 **Income and Principal for Irene P. Ballas.** During the life of Irene, Trustee shall pay to or apply for her benefit such amounts of income or principal, or both, as Trustee, in its discretion, deems necessary, advisable or expedient for Irene's best interests. Undistributed income shall be accumulated and added to principal.
>
> 3.2 **Distribution Upon the Death of Irene P. Ballas.** Upon the death of Irene, if Grantor's Spouse is then living, Trustee shall distribute one-third (1/3) of the property remaining in Trust C to Trust A, to be administered and distributed as a part thereof. The remaining property in Trust C shall be distributed as if Grantor survived Grantor's Spouse, in accordance with the terms and provisions of Article 4, beginning with Section 7.2 of this trust.

4.   **Distribution or Purchase of Motor Vehicle to Grantor's Spouse.** If Grantor's Spouse survives Grantor and if she does not own a motor vehicle upon Grantor's death, Trustee shall distribute to Grantor's Spouse a new motor vehicle comparable to a fully equipped Buick Riviera to be purchased by this trust, or in lieu thereof, sufficient funds for Grantor's Spouse to purchase a new motor vehicle comparable to a fully equipped Buick Riviera.

5.   **Payment of Note Secured by Mortgage of Grantor's Principal Residence.** If Grantor's Spouse survives Grantor and if a mortgage encumbers Grantor's primary residence on Grantor's date of death, Trustee shall satisfy all indebtedness which is necessary for Grantor's Spouse to obtain a release of any mortgage which encumbers the primary residence of Grantor at the time of Grantor's death, whether such primary residence is owned by Grantor and Grantor's Spouse jointly with rights of survivorship, or whether such primary residence is titled in the name of this trust.

6.   **Marital Trust a/k/a Trust A.** If Grantor's Spouse survives Grantor, Trustee shall allocate to and hold in a separate trust (Trust A) for the sole use and benefit of Grantor's Spouse, an amount, after the payment of all estate, inheritance, legacy or succession taxes assessable by reason of Grantor's death; equal in value to one-third (1/3) of the value of Grantor's Adjusted Gross Estate, as defined in Section 6166 of the Internal Revenue Code of 1986, as thereafter may be amended ("Code"), minus (1) the net federal estate tax value of Grantor's primary residence and all tangible personal property bequeathed to Grantor's Spouse under Grantor's Last Will and Testament, (2) the value of the motor

3

vehicle or the funds distributed to purchase the motor vehicle pursuant to Article 4, Section 4 of this trust and (3) the amount of any indebtedness satisfied by this trust pursuant to Article 4, Section 5 of this trust, after the payment of all estate, inheritance, legacy or succession taxes assessable by reason of Grantor's death; provided, any tax imposed by Chapter 13 of the Code shall be charged to the property causing the tax in the manner provided by applicable law. Only property which qualifies for the marital deduction shall be allocated to Trust A. Grantor's Spouse shall have the power, at any time, upon written notice delivered to Trustee, to require Trustee to convert, within a reasonable time, any non-income producing property to income-producing property. The income and principal of Trust A shall be distributed by Trustee as follows:

> 6.1. **Distribution of Income to Spouse.** Trustee shall, annually or at more frequent intervals, pay to or apply for the benefit of Grantor's Spouse all the income of Trust A.

> 6.2 **Distribution of Principal to Spouse.** Trustee may pay to or apply for the benefit of Grantor's Spouse such amounts of principal as Trustee deems necessary, advisable, or expedient for the health, education, support, or maintenance of Grantor's Spouse.

> 6.3 **Distribution upon Death of Spouse.** Upon the death of Grantor's Spouse, Trustee shall, from the property of Trust A, pay to the executor, personal representative, or administrator of the estate of Grantor's Spouse an amount equal to the sum of the aggregate of any increase in any state and federal estate or other death taxes assessable against Grantor's Spouse's estate measured by the difference between the taxes actually payable and the taxes which would have been payable if the property in Trust A had been excluded from the amount with respect to which said taxes are actually computed. Any United States Treasury obligations held in Trust A, which are redeemable at par in payment of federal estate taxes, shall, to the extent hereinbefore limited, be applied for such purpose. The remainder of the property in Trust A shall be administered and distributed as follows:

>> 6.3.1 **Grantor's Spouse's Special Testamentary Power of Appointment.** Trustee shall distribute twenty percent (20%) of the property remaining in Trust A among Grantor's Spouse's issue, in such shares and amounts, and upon such terms, conditions, and estates, in trust or otherwise, as Grantor's Spouse may appoint by express reference to this Agreement in Grantor's Spouse's Last Will and Testament duly admitted to probate. The

4

property in Trust A over which Grantor's Spouse has a testamentary special power of appointment and as to which Grantor's Spouse has not effectively exercised such testamentary special power of appointment shall be distributed to Grantor's Spouse's issue, per stirpes.

6.3.2 **Distribution of Remaining Trust Property.** The property remaining in Trust A shall be added to Trust B to be administered and distributed as a part thereof, or in the event Trust B-is not then in existence, the remainder of the property shall be distributed as if Grantor survived Grantor's Spouse, in accordance with the terms and provisions of Article 4, beginning with Section 7.2.

6.4 **Direction to Elect Marital Deduction.** Grantor intends that Trust A qualify for the marital deduction in determining the federal estate tax payable as a result of Grantor's death. Accordingly, to the extent required to permit such marital deduction, the Grantor directs the Trustee to elect to treat the assets in Trust A as qualified terminable interest property under the Code. The Grantor further directs that no authorization, direction or other provisions contained in this instrument which would otherwise prevent Trust A from qualifying for the QTIP election shall apply to Trust A and any court having jurisdiction over this instrument shall construe it accordingly.

6.5 **Vesting.** Even though the ultimate composition of this trust may not be determined until a later date, the interest of Grantor's Spouse in Trust A shall run from the date of Grantor's death and shall relate to all property finally allocated thereto.

7. **Credit Shelter Trust a/k/a Trust B.** Following the death of Grantor, the property not allocated to Trust A, or all the trust property if Grantor is not survived by Grantor's Spouse, shall be administered as a separate trust (Trust B), the income and principal of which shall be distributed as follows:

7.1 **Tax and Other Payments.** Trustee may, but shall not be compelled to, pay or advance to the executor, personal representative, or administrator of Grantor's estate sufficient funds to pay, or Trustee may directly pay, all or any part of the debts and obligations of Grantor, whether secured or unsecured, costs and expenses of administration, and any estate, inheritance, succession, or other death taxes, including any interest and penalties, assessed by any jurisdiction against Grantor's estate or payable by reason of Grantor's death with

5

respect to any property included in Grantor's estate for death tax purposes, whether or not such property or interest passes under Grantor's Will, this Agreement, or otherwise, or is assessed against any recipient thereof. Any United States Treasury obligations held in Trust B, which are redeemable at par in payment of federal estate taxes, shall be applied for such purpose.

7.2   **Distribution to Grantor's Issue.**   Trustee shall divide the property remaining in Trust B into equal parts on the basis of one (1) part for each child of Grantor then living, and one (1) part for each deceased child of Grantor leaving issue then living.   Each part shall constitute a separate trust and shall be administered and distributed as follows:

> 7.2.1   **Distribution of Separate Trust Created for Living Child.**   Trustee shall immediately distribute to each living child of Grantor all the property in such child's separate trust.
>
> 7.2.2   **Distribution of Separate Trust for Issue of Deceased Child.**   Trustee shall administer and distribute the property of each separate trust created for the benefit of each deceased child of Grantor leaving issue then living as follows:
>
>> 7.2.2.1   Trustee shall pay to or apply for the benefit of the issue of a deceased child such amounts of income or principal, or both, as Trustee deems necessary, advisable, or expedient for the health, education, support, or maintenance of any of the issue of a deceased child, without obligation to treat all of the issue equally.   Undistributed income shall be accumulated and added to principal.
>>
>> 7.2.2.2   Trustee shall distribute all the property in the trust to the issue, per stirpes, of the deceased child of Grantor on whose behalf a separate trust was created, when all the living children of such deceased child of Grantor have attained age twenty-one (21) or upon the death of the last surviving child of such deceased child of Grantor prior to having attained age twenty-one (21).
>
> 7.2.3   If, at any time, there is no beneficiary of a separate trust hereunder, the property in the trust shall be distributed to the Grantor's issue, per stirpes; provided, however, if Trustee is then

6

administering a separate trust hereunder for the benefit of the issue of a deceased child of Grantor, the distributive portions of all of the issue of such deceased child shall be added to the property of such trust and administered as a part thereof.

7.3 **Distribution if no Issue are Living.** If, at anytime there are no issue of Grantor then living, Trustee shall distribute the trust property to Grantor's Spouse, if she is then living; and if Grantor's Spouse is not then living, then to such persons then living, and in such shares and amounts, as would take Grantor's personal property under the Ohio Statute of Descent and Distribution then in force if Grantor had died intestate at that time domiciled in Ohio.

8. **Distribution to a Beneficiary Who is Under Legal Disability.** If a beneficiary is under legal disability, including minority, any distribution to be made to such beneficiary, in Trustee's sole and absolute discretion, may be made to a parent of such beneficiary, to the guardian of the estate of such beneficiary, to the person or institution having custody of such beneficiary, or to a custodian of a minor beneficiary under the Transfers to Minors Act or Uniform Gifts to Minors Act, or similar Act, of the State of Ohio, or of the state wherein such minor beneficiary resides, including a custodian selected by Trustee, and which custodian may be an individual or corporation serving as Trustee. Any person or institution receiving such payments shall use or preserve same for the immediate or ultimate benefit of such beneficiary, and shall be required to make such accounting of said payments as Trustee may request in writing. If, at any time, Trustee believes that any principal payments being made to a person or institution hereunder are not being used or preserved for the benefit of such beneficiary, Trustee may discontinue such principal payments to such person or institution and may itself make and/or preserve any or all future payments for the use and benefit of such beneficiary.

## ARTICLE 5

### SPENDTHRIFT PROVISION

No beneficiary shall have the right or power to transfer, assign, alienate, anticipate, pledge, or otherwise encumber such beneficiary's interest or right to receive income or principal payments under any trust created herein. No beneficiary's interest or right to receive income or principal payments under any trust created herein shall be subject to seizure, attachment, or claims of creditors.

7

## ARTICLE 6

### POWERS OF TRUSTEE

1. Without the order or approval of any court or person, and without regard to any statute, court decision, or regulation concerning actions by fiduciaries, Trustee shall have full power and authority:

> 1.1 **Investment**. To hold, sell, invest, and reinvest any part or all of the trust property, whether real or personal, including investment in any mutual funds or common trust funds managed by Trustee or in any securities issued by any corporation acting as Trustee hereunder, or the holding company of which it is an affiliate;

> 1.2 **Receive Income**. To collect, recover, and receive the rents, income, and proceeds from any trust property;

> 1.3 **Retention and Purchase of Certain Assets**. To retain any property received by Trustee at any time, irrespective of the kind and nature thereof, and to purchase, and thereafter to retain, property from the estates of Grantor, Grantor's Spouse, or any of Grantor's issue, irrespective of the kind and nature thereof;

> 1.4 **Retention of Real Property**. To retain any real property used as Grantor's principal residence which becomes part of any trust created herein and to pay all taxes, insurance, and all upkeep of such property. Trustee may permit the rent-free use of such property by Grantor's Spouse and/or Grantor's issue. Trustee may sell such property and invest the proceeds in another residence for the same purpose;

> 1.5 **Merge Similar Trusts**. To merge any of the separate trusts created hereunder, other than a trust for which a marital deduction is allowed, with any other trust created by Grantor, or by Grantor's Spouse, provided the terms of the other trust are substantially similar;

> 1.6 **Title to Securities**. To cause any securities or other trust property to be issued, held, or registered in the name of a nominee, or in such form that title will pass by delivery;

> 1.7 **Voting Rights**. To vote by proxy, or in person, and to exercise all other rights in regard to all stocks and securities registered in the name of Trustee, including securities issued by any corporation acting as Trustee

8

hereunder, or the holding company of which it is an affiliate;

1.8 **Disclaimer**. To disclaim, in whole or in part, the succession to any property to which Trustee may be entitled;

1.9 **Employment of Agents**. To employ and compensate agents, attorneys, accountants, appraisers and other advisers, for whose neglect, omission, or misconduct Trustee shall not be liable if selected by Trustee with reasonable care and in good faith;

1.10 **Appoint Attorney-in-Fact**. To appoint Attorneys-in-fact and to execute and deliver powers of attorney, with or without discretionary powers;

1.11 **Employment of Investment Manager**. To employ and compensate an investment manager to manage all or any part of the trust property and to delegate to said manager investment discretion, including the power to acquire and dispose of trust property;

1.12 **Borrow Money**. To borrow money from itself, or from any other person, for any purpose it may deem necessary, advisable, or expedient, and to pledge trust property as security therefor;

1.13 **Mortgage Trust Assets**. To mortgage or pledge trust property as security for any obligation of Grantor, or for any other person, if so directed by Grantor in writing;

1.14 **Margin Account**. To open and maintain a margin account, and to pledge trust property as security therefor;

1.15 **Stock Options and Commodities**. To buy and sell, in a cash or margin account, index and stock options, covered and uncovered, and commodities;

1.16 **Separate Trusts**. To hold and administer the trust property, or any part thereof, as an undivided whole in which the separate trusts created herein shall have undivided interests, or to make physical division of the trust property and hold and administer each separate trust for the benefit of the beneficiaries thereof;

1.17 **Allocation of Trust Assets**. To allocate or distribute trust property in cash or in kind, or in combination thereof, without regard to Trustee's basis thereof, Trustee's determination as to the valuation and

9

equality of any such allocation or distribution being conclusive upon all persons who are benefited hereunder or otherwise interested in any of the trusts created herein;

1.18 **Purchase of Life Insurance.** To purchase, receive, and hold as a trust investment a life insurance policy on the life of Grantor, or on any beneficiary, or on the life of any person in whom Grantor or any beneficiary has an insurable interest, provided Trustee is named as beneficiary thereof, and to exercise any right or privilege granted by the policy;

1.19 **Life Insurance Proceeds.** To receive any proceeds on any insurance policy in terms due and payable to Trustee, with or without further words of description, after deduction of any outstanding charges against the policy by way of advances, loans or otherwise, now or hereafter made by the insurance company on account of such policy. Trustee may bring suit to collect the proceeds if, in the opinion of legal counsel, suit is necessary and advisable, provided payment of its expenses has been guaranteed in a reasonably satisfactory amount and manner;

1.20 **General.** To do all acts and things which Trustee deems necessary, advisable, or expedient for the proper and advantageous management of the trust property, to the same extent and with like effect as might be done in the exercise of ordinary prudence by an individual with absolute ownership and control of the property.

2. **Prevent Disqualification of Marital Deduction.** In no event shall Trustee exercise any power, authority, or discretion in any manner which would prevent any trust created hereunder from qualifying for the marital deduction under federal or state estate tax laws.

3. **Trustee Cannot Satisfy Own Legal Obligation.** Notwithstanding any other provision of this Agreement, a Trustee, other than Grantor, shall not exercise any right, power, or discretion in favor of any beneficiary which satisfies a legal obligation of such Trustee.

4. **Small Trust Termination Provision.** If a Corporate Trustee is serving as Trustee and determines that, under existing economic or tax conditions, a separate trust created hereunder is of such size as to no longer render its continuance in the best interests of the beneficiary or beneficiaries thereof, it may, in its sole and absolute discretion, terminate such separate trust and distribute the trust property amongst the trust's then living

10

vested or contingent beneficiaries, without obligation to treat all such beneficiaries equally.

5. **Corporate Trustee to Seek Advice of Grantor.** If a Corporate Trustee is serving as Trustee, it shall seek the advice of Grantor on all matters regarding the investment of the trust property, although the approval of Grantor is not necessary.

6. **Generation-Skipping Transfer Taxes.** It is Grantor's intention to eliminate (or to reduce as fully as allowed by law) any "generation-skipping transfer taxes" on transfers of property pursuant to this Agreement. Grantor intends that the Trustee shall not be required to administer a trust hereunder that is only partially exempt from generation-skipping taxes, or to commingle property subject to different treatment for generation-skipping transfer tax purposes whether because the transferors with respect to the property are assigned to different generations or otherwise. The provisions of this Article 6, Section 6 are intended to enable the Trustee to avoid such situations, and the provisions of this Article 6, Section 6 shall be applied in a manner consistent with this intention. Accordingly, notwithstanding any other provisions of this Agreement:

> 6.1 **Definitions.** When used in connection with these provisions dealing with the federal generation-skipping transfer tax, "Skip Persons", "Inclusion Ratio", "Transferor" and "GST exemption" have the meanings as defined for purposes of said tax. Unless otherwise indicated, references to "Sections" or to "Chapters" refer to Sections and Chapters of the Internal Revenue Code of 1986, as amended, and to their current counterparts under any future federal tax law.

> 6.2 **Authority to Create Separate Trust for Allocation of Exemption.** If a trust held under this Agreement would otherwise be partially exempt from generation-skipping transfer tax due to the intended allocation of a GST exemption provided for under Section 2631(a), then, before such allocation and as of the relevant valuation date under Section 2642 with respect to such allocation, the Trustee may (but need not) divide that trust (the "Original Trust") into two (2) separate trusts of equal or unequal value which shall be identical in all other respects to the Original Trust, so that the allocation of such GST exemption can be made to one trust in order that later distributions from such trust will be entirely exempt from generation-skipping transfer tax. The two trusts created under this subsection 6.2 (sometimes referred to herein as "related") shall have the same name and be administered under the same terms as the Original Trust except that the trust to which such GST exemption

11

is allocated shall have the phrase "GST exempt" added to its name.

6.3 **Authority to Separate Property Having Different GST Treatment.** If property, which is held in, or is to be added or allocated to a trust pursuant to this Agreement is subject to different generation-skipping transfer (GST) tax treatment under Chapter 13, then Trustee may, but need not, separate the trust property in order to distinguish GST exempt property from GST non-exempt property. The separation of property for this purpose shall result in the creation of two identical trusts that will sometimes be referred to herein as "related".

6.4 **Division of Trusts.** The Trustee may (but need not) divide, in its sole discretion, (i) property in any trust being held hereunder with an inclusion ratio, as defined in Section 2642(a)(1), of neither one nor zero into two separate trusts representing two fractional shares of the property being divided, one to have an inclusion ratio of one and the other to have an inclusion ratio of zero, (ii) property in any trust being held hereunder, with different transferors, into separate trusts for different transferors, which trusts may have more than one transferor. The identical trusts resulting from application of this subsection 6.4 are also sometimes referred to herein as "related."

6.5 **Provisions Regarding Distributions.** Grantor requests (but does not require) that:

6.5.1 Any distribution under this Agreement to a "Skip Person" (other than a transfer described in Section 2611(b)(2)) be first charged against any separate GST exempt trust held for such individuals unless the property of such trust is exhausted or not reasonably available.

6.5.2 Distributions to any beneficiary (other than a "Skip Person") of income or principal shall not be charged against GST exempt trusts held for such beneficiary unless otherwise required under other provisions of this Agreement or unless all other property of all other trusts held for such beneficiary is exhausted or is not reasonably available.

6.5.3 In applying the above rules, the Trustees shall consider the effects on overall transfer taxes of distributing property of Trust A as to which Grantor's Spouse, rather than Grantor, is treated as the transferor for generation-skipping

12

transfer tax purposes, and make distributions from such properties and portions thereof as will achieve the lowest level of such overall transfer taxes. For example, if Grantor's Spouse survives Grantor and a child of Grantor and Grantor's Spouse does not survive Grantor's Spouse, but such child leaves children who are then living, the Trustees should (unless they determine it to be inappropriate for tax or other reasons) satisfy the gifts or shares to be made to or held for such children of a predeceased child only from assets as to which Grantor's Spouse is treated as such transferor to take advantage of the so-called "predeceased child exception" of Section 2612(c)(2).

6.5.4 The Trustee shall first allocate property to which a GST exemption has been allocated to separate trusts held for any Skip Person or distributable in whole or in part to or for the benefit of such Skip Person, and next allocate property to which a GST exemption has been allocated to separate trusts which are potentially distributable to any Skip Person either as a "Taxable Distribution" or a "Taxable Termination."

6.5.5 It is the Grantor's intention that any unused GST exemption remaining at his death be allocated first to the Credit Shelter Trust to the extent necessary to fully protect the assets therein from the GST taxes and then any remaining to the QTIP Marital Deduction Generation-Skipping Tax election Trust to the extent necessary to fully protect the assets therein from the generation-skipping transfer tax. The Grantor directs that his Executor and Trustee act in accordance with this intent.

6.6 **Making a QTIP Election for GST and/or Estate Tax Purposes.** As to any assets herein over which the Trustee is empowered to make a QTIP election or a Reverse Transferor QTIP Election, to the extent required by law to permit such election, the Trustee is empowered to make such election for both estate and generation-skipping tax purposes or for estate tax purposes alone or for GST tax purposes alone and to allocate the unused portion of the Grantor's GST exemption to any property with respect to which the Grantor is the transferor for generation-skipping tax purposes in such manner the Trustee deems advisable, in each case without regard to the relevant interests of the beneficiaries. The Trustee is hereby authorized to, exercise any right of election in the

13

manner as the Trustee in his absolute discretion determines to be advisable even though the manner in which the election is exercised may result in an advantage or disadvantage to any beneficiary or beneficiaries hereunder as compared with any other beneficiary or beneficiaries hereunder. The Trustee shall not be required to make any compensating adjustment between any of the beneficiaries which may result from the election.

6.7 **Restrictions on GST Allocation Where Trustee is Beneficiary**. Notwithstanding the foregoing, if the Trustee is a beneficiary under this Trust Agreement, the Trustee's powers and election rights for generation-skipping tax purposes shall not be exercised or exercisable in a manner which would cause inclusion of GST Exempt trust assets or other assets of the trust estate in the estate of or result in taxable gifts having been made by such Trustee-beneficiary by virtue of possession or exercise of such powers and election rights. If necessary, the Trustee may nominate and appoint (or have appointed) an independent Trustee solely for the purpose of the exercise of such powers and election rights. Any Trustee so specifically appointed shall be independent and non-subordinate so that the intentions of the Grantor to minimize gift, estate, and generation-skipping taxes is accomplished. This power to nominate and appoint (or have appointed) an independent special Trustee is exercisable in a fiduciary capacity. Such specially appointed Trustee shall have for such purposes all the immunities, powers, and discretion described in this instrument and shall be indemnified and held harmless from all costs and expenses and claims resulting from the possession or exercise of such powers and election rights so long as made in good faith.

6.8 **Testamentary General Power of Appointment**. If any beneficiary of a separate trust, except Grantor's Spouse, dies prior to complete distribution of such trust, then, in the event all or a portion of the separate trust is subject to the provisions of the generation-skipping tax imposed by Chapter 13 of the Internal Revenue Code of 1986, as thereafter amended, Trustee shall distribute such property to such beneficiary's spouse, to one or more of such beneficiary's issue or Grantor's issue then living, or in trust or trusts created for their benefit, or to the creditors of the estate of such beneficiary, in such shares and amounts, as such beneficiary may appoint by express reference to this testamentary general power of appointment in his or her Last Will and Testament duly admitted to probate. The powers granted in this section shall apply notwithstanding the Article of this Agreement

14

entitled "Spendthrift Provision." In default of the effective exercise of the testamentary general power of appointment under this Article 6, Trustee shall pay to the Executor or Administrator of the estate of such beneficiary an amount not exceeding the total amount of federal and state death taxes, if any, payable by the estate due to the inclusion of the assets of a separate trust created hereunder in the taxable estate of such beneficiary. Thereafter, any assets remaining in such trust(s) shall be administered and distributed in accordance with the terms and provisions of Article 4.

## ARTICLE 7

### AS TO TRUSTEE

1.  **Maintenance of Records.** Trustee shall keep and maintain adequate books and records reflecting all income and principal transactions of each separate trust, which books and records shall be open at all reasonable times to the inspection of Grantor, and after Grantor's death to Grantor's Spouse, and after the death of Grantor's Spouse to the beneficiaries to whom Trustee is then authorized or required to distribute income, or any of their duly authorized representatives. Furthermore, Trustee shall furnish, at least quarterly, statements of all transactions to Grantor, and after Grantor's death to Grantor's Spouse, and after the death of Grantor's Spouse to the beneficiaries to whom Trustee is then authorized or required to distribute income, or any of their duly authorized representatives.

2.  **Bond not Required.** No Trustee shall be required to furnish any bond or security for the performance of its duties hereunder.

3.  **Compensation of Trustee.** Trustee shall be paid reasonable compensation for its services which shall be made from income or principal, or both, as Trustee deems just and equitable.

4.  **Successor Trustees.** Upon the death, removal, resignation, or legal incapacity of Trustee, or any successor Trustee, **WILLIAM L. VAUGHAN** and **KEY TRUST COMPANY OF OHIO, N.A.,** or its successor by merger, consolidation or otherwise ("Corporate Trustee"), shall serve as successor co-Trustees; provided, however, upon the death, removal, resignation, or legal incapacity of **WILLIAM L. VAUGHAN** as co-Trustee, **KEY TRUST COMPANY OF OHIO, N.A.** shall serve as sole successor Trustee.

5.  **Resignation of Trustee.** Any Trustee or successor Trustee may resign as Trustee of any one or more of the separate trusts created herein upon written notice to Grantor, and after Grantor's death upon written notice to Grantor's Spouse, and after the death

15

of Grantor's Spouse upon written notice to the beneficiaries to whom Trustee is then authorized or required to distribute income from such separate trust.

6. **Removal of Trustee.** Any Trustee or successor Trustee may be removed as Trustee of any one or more of the separate trusts created herein by written notice from Grantor, and after Grantor's death, by written notice from Grantor's Spouse.

7. **Appointment of Successor Trustee.** Upon the resignation or removal of Corporate Trustee, or any successor thereto, a successor Trustee shall be appointed by an instrument in writing signed by, or on behalf of, the following individuals:

    a.   during Grantor's lifetime, by Grantor;

    b.   after Grantor's death, by Grantor's Spouse.

Any successor Trustee shall be a bank or trust company authorized to conduct a trust business under the laws of any state or of the United States.

8. **Delivery of Trust Property to Successor Trustee.** Trustee, or any successor Trustee, who has resigned or has been removed, shall deliver the trust property to its successor upon its successor's acceptance of the trust.

9. **Successor Trustee not Liable.** No successor Trustee shall be held liable for any act or failure to act of a predecessor Trustee.

10. **Rights of Successor Trustee.** Any successor Trustee shall have the same rights, powers, discretions, trusts, duties, and obligations as though originally designated herein.

## ARTICLE 8

### INCONTESTABILITY

If any beneficiary hereunder shall contest the probate or validity of this trust or Grantor's most recently dated Last Will and Testament ("Will"), or any provision of Grantor's trust or Will, or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this trust or Grantor's Will or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided for such beneficiary and the issue of such beneficiary are revoked and such benefits shall pass to the other beneficiaries of this trust in the proportion that would result under this trust if such person or persons contesting this

16

trust or Grantor's Will died without surviving issue immediately before the Grantor. If all of the beneficiaries join in such contest or proceedings, then such benefits shall pass to those persons (other than the persons joining in such contest) who are living at Grantor';s death and who would have been Grantor's distributee had Grantor died intestate a resident of the State of Ohio, and had the person or persons contesting Grantor's trust or Will died without surviving issue immediately before Grantor. Each benefit conferred herein is made on the condition precedent that the beneficiary shall accept and agree to all of the provisions of this trust and the provisions of this Article 8 are an essential part of each and every benefit.

## ARTICLE 9

### GENERAL PROVISIONS

1. **Ohio Law Governs.** This Agreement shall be governed by the laws of the State of Ohio.

2. **Perpetuities Savings Clause.** Notwithstanding any other provision of this Agreement, twenty-one (21) years after the date of death of the survivor of all of the beneficiaries hereunder who are in being at the date this Agreement becomes irrevocable, Trustee shall distribute any property remaining in any of the separate trusts created hereunder in equal shares, per capita, to the beneficiaries thereof to whom Trustee is then authorized or required to distribute income from such trust.

3. **Severability Clause.** If any provision of this Agreement or the application thereof to any person, interest, or circumstance is held invalid, the remainder of the Agreement and the application of such provision to other persons, interests, or circumstances shall not be affected thereby.

4. **Binding Effect.** This Agreement shall extend to and be binding upon the heirs, executors, administrators, legal representatives and successors, respectively, of the parties hereto.

5. **Words Construed in Context.** Whenever words are used in this Agreement in the singular or plural form, they shall be construed as though they were used in the form appropriate to the circumstances.

17

6. **Captions**. The captions/headings in this trust are for convenience only.

**GEORGE P. BALLAS** has signed this Agreement as Grantor and as Trustee on the date hereof.

GEORGE P. BALLAS, Grantor

GEORGE P. BALLAS, Trustee

## AMENDMENT TO
## GEORGE P. BALLAS
## AMENDED TRUST

Grantor:          GEORGE P. BALLAS

Trustee:          GEORGE P. BALLAS

Trust Name: ·     GEORGE P. BALLAS AMENDED TRUST

Date:             January 23      , 1999

Grantor and Trustee executed an Amended Trust on August 1, 1997 in which Grantor reserved the power to amend any of the Trust Agreement's terms.

Grantor and Trustee agree that the Trust Agreement is hereby amended at Article 7, Section 4 as follows:

" 4. Successor   Trustees.   Upon the death, removal, resignation, or legal incapacity of Trustee, or any successor Trustee, WILLIAM L. VAUGHAN and NATIONAL CITY BANK, or its successor by merger, consolidation, or otherwise ("Corporate Trustee"), shall serve as successor co-Trustees; provided, however, upon the death, removal, resignation, or legal incapacity of WILLIAM L. VAUGHAN as co-Trustee, NATIONAL CITY BANK CITY shall serve as sole successor Trustee."

All of the terms and provisions of the GEORGE P. BALLAS AMENDED TRUST, as hereby amended, are ratified, approved, and confirmed.

I have signed this Agreement as Grantor and as Trustee on the date hereof.

GEORGE P. BALLAS, Grantor

GEORGE P. BALLAS, Trustee

h:\home\pln\mb\ep\ballas-amd2

## SECOND AMENDMENT TO
## GEORGE P. BALLAS
## AMENDED TRUST AGREEMENT

Grantor:              **GEORGE P. BALLAS**

Trustee:              **GEORGE P. BALLAS**

Trust Name:           **GEORGE P. BALLAS AMENDED TRUST**

Date:                 **NOVEMBER 27, 2001**

Grantor and Trustee executed a Trust on August 1, 1997, as amended on January 23, 1999, in which Grantor reserved the power to amend any of the Trust Agreement's terms.

Grantor and Trustee agree that the Trust Agreement is hereby amended as follows:

1.    In Article 4, a new Section 6.6 is added to read as follows:

6.6   **Retirement Plan Benefits.** I intend to make payable to the trust some or all of my Retirement Plan accounts in a manner which will qualify for the federal and Ohio estate tax marital deduction and so that the income recognized on such distributions will not be accelerated. Accordingly, the purpose of this Section shall be construed to effectuate my intention.

6.6.1 **Definitions:**

6.6.1.1 **"Code"** means the Internal Revenue Code of 1986, as amended ("Code") from time to time.

6.6.1.2 **"Fiduciary Accounting Income"** means the greater of:

6.6.1.2.1   all of the income of a Retirement Plan as determined under the laws of the State of Ohio that are applicable to trusts and as described under section 643(b) of the Code, or

6.6.1.2.2   the amount required to be distributed by section 2056(b)(7) of the Code to qualify my Spouse's interest in the Retirement Plan and in this Trust, as "qualified terminable interest property" as defined in the Code.

6.6.1.3 The Retirement Plan's Fiduciary Accounting Income shall be determined as of my date of death and shall relate to all such income earned thereafter until the date of my Spouse's death.

6.6.1.4 **"Required Minimum Distribution Amount"** means the minimum amount required to be distributed each year under Code sections 401(a)(9) and 408(a)(6).

6.6.1.5 **"Retirement Plan"** means any qualified pension, profit sharing, stock bonus, Keogh, or other qualified plan, trust, contract, account, annuity or bond, or individual retirement account (IRA), as those terms are defined in the Code, or any non-qualified deferred compensation agreement, salary continuation agreement, or similar arrangement.

6.6.2 **Trustee to Direct Receipt of Retirement Plan Payments.** Notwithstanding any other provision of this Agreement, if I am survived by my Spouse and if one or more Retirement Plans are distributed or distributable to the Trust, then upon my death, Trustee shall withdraw from each Retirement Plan, at least annually for each calendar year the greater of (a) the Required Minimum Distribution Amount, distributable before the close of each calendar year end, or (b) each Retirement Plan's Fiduciary Accounting Income.

6.6.2.1 Trustee shall take all necessary actions to cause the Retirement Plan to distribute to the Trust the amount required to be distributed under this Section.

6.6.2.2 Any proceeds received by Trustee from any Retirement Plan shall be treated by Trustee as principal for trust accounting purposes, except that any Fiduciary Accounting Income within the Retirement Plan on the property held therein as a result of an installment or other election or any other deferral of payment of the Retirement Plan's proceeds to Trustee shall be treated by Trustee as income when received.

2

2. A new Article 10 is added to read as follows:

## ARTICLE 10

## RETIREMENT PLAN BENEFITS

If Trustee is named as the beneficiary of retirement plan benefits that are subject to the minimum distribution rules of Code section 401(a)(9), and if under the circumstances existing at my date of death the benefits or the right to receive the benefits may continue to be held in trust (and for this purpose the survival of the beneficiaries for any post death survivorship period shall be presumed), then: if (a) I die prior to my required beginning date (as that term is used in Code section 401(a)(9)); or (b) (i) I die on or after the required beginning date and (ii) if this trust is a "designated beneficiary" for purposes of the minimum distribution rules, then, in either case (a) or (b), the following rules apply:

1. Except as provided in this paragraph, such retirement plan benefits shall not be: (1) distributed, after December 31 of the year following the year of my death, to or for the benefit of my estate, any charity, or any other non-individual beneficiary, (2) used to pay pecuniary bequests, if other assets are available for those purposes, (3) subject to any special power of appointment granted to a beneficiary, or (4) used or applied for payment of my debts, taxes, expenses of administration or other claims against my estate, nor for payment of estate, inheritance or similar transfer taxes due on account of my death except to the minimum extent that would be required under applicable state or federal tax apportionment law in the absence of any specific provision on the subject in my Last Will and Testament or this trust. This paragraph shall not apply to any charitable bequest which is specifically directed to be funded with retirement benefits by other provisions of this instrument.

2. If the trust estate is divided into fractional shares, the interests of the Trustee (and the beneficiaries) of a particular trust in retirement plan benefits shall be likewise divided, proportionately.

3. Trustee shall deliver a copy of this trust agreement to the plan administrator or custodian of any plan or individual retirement account under which this trust is a designated beneficiary and provide any other documentation required by such plan administrator or custodian by December 31 of the year following the year of my death.

3

4.      ·I intend to insure that the trust be considered a designated beneficiary and that
the beneficiaries of the trust be identifiable, so that, if appropriate, the life
expectancies of the beneficiaries may be used to calculate the minimum distributions
required by Code section 401(a)(9). The provisions of this trust shall be interpreted
with this intent being paramount to any other direction in the trust.

All of the terms and provisions of the **GEORGE P. BALLAS AMENDED TRUST
AGREEMENT**, as hereby amended, are ratified, approved, and confirmed.

I have signed this Amendment as Grantor and as Trustee on the date hereof.

GEORGE P. BALLAS, Grantor

GEORGE P. BALLAS, Trustee

H:\HOME\KMHansen\GLM\Ballas\second amend to amended trust 110601.wpd

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

IN RE:                                              CASE NO. 09-12545-EPK

PETER G. BALLAS, II,                                JUDGE: ERIK P. KIMBALL

Debtor.                                             CHAPTER 11

_____/

## DEBTOR'S STANDARD MONTHLY OPERATING REPORT (INDIVIDUAL)

### FOR THE PERIOD

FROM January 1, 2010 TO January 31, 2010

Comes now the above-named debtor and files his Monthly Operating Reports in

accordance with the Guidelines established by the United States Trustee and FRBP 2015.

Dated: February 22, 2010                    REIZES LAW FIRM, CHARTERED

By: /s/ Leslie N. Reizes
    Leslie N. Reizes
    Florida Bar No. 208108
    Attorney for Debtor
    1200 South Federal Highway, Suite 301
    Boynton Beach, Florida 33435
    Telephone: 561-736-2600
    Fax: 561-736-2700
    E-mail: reizes@bellsouth.net

Debtor's Address and Phone Number
3960 N. Ocean Blvd., Apt. 1
Gulfstream, FL 33484
Telephone: 561-989-9002



EXHIBIT

C

MONTHLY OPERATING REPORT - INDIVDUAL

ATTACHMENT NO. 1

| QUESTIONNAIRE | | |
|---|---|---|
| | YES* | NO |
| 1. Have any assets been sold or transferred outside the normal course of business during this reporting period? | | ✓ |
| 2. Have any funds been disbursed from any account other than a debtor in possession account? | | ✓ |
| 3. Are any post-petition receivables (accounts, notes, or loans) due from any relatives, insiders, or related party? | | ✓ |
| 4. Have any payments been made on pre-petition liabilities this reporting period? | | ✓ |
| 5. Have any post-petition loans been received by the debtor from any party? | | ✓ |
| 6. Are any post-petition payroll taxes past due? | | ✓ |
| 7. Are any post-petition state or federal income taxes past due? | | ✓ |
| 8. Are any post-petition state or local sales taxes past due? | | ✓ |
| 9. Are any post-petition real estate taxes past due? | | ✓ |
| 10. Are any amounts owed to post-petition creditors/vendors delinquent? | | ✓ |
| 11. Are any wage payments past due? | | ✓ |

*If the answer to any of the above questions is "YES," provide a detailed explanation of each item on a separate sheet.

| INSURANCE INFORMATION | | |
|---|---|---|
| | YES | NO* |
| 1. Are real and personal property, vehicle/auto, general liability, fire, theft, worker's compensation, and other necessary insurance coverages in effect? | ✓ | |
| 2. Are all premium payments current? | ✓ | |

- *If the answer to any of the above questions is "NO," provide a detailed explanation of each item on a separate sheet.

| CONFIRMATION OF INSURANCE | | | | | |
|---|---|---|---|---|---|
| TYPE of POLICY | and | CARRIER | Period of Coverage | Payment Amount and Frequency | Delinquency Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

✓ Check here if United States Trustee has been listed a a Certificate Holder on all policies of insurance.

DESCRIBE PERTINENT DEVELOPMENTS, EVENTS, AND MATTERS DURING THIS REPORTING PERIOD:

Estimated Date of Filing the Plan of Reorganization and Disclosure Statement: ___ _____

### SUMMARY OF CASH RECEIPTS AND CASH DISBURSEMENTS

Jan-10

| Case Name: | Peter G Ballas, II |
|---|---|
| Case Number: | No. 09-12545-EPK |

Note: The Information requested below is a summary of the information reported the various Schedules and Attachments contained within this report.

| | Month<br>Jan | | Cumulative<br>Total | |
|---|---|---|---|---|
| CASH-Beginning of Month (Household) | $ | 1,795.04 | $ | 1,795.04 |
| CASH-Beginning of Month (Business) | | 0.00 | | 1,795.04 |
| | | | | |
| Total Household Receipts | | 4,241.88 | | 4,241.88 |
| Total Business Receipts | | | | 0.00 |
| Total Receipts | $ | 4,241.88 | $ | 4,241.88 |
| | | | | |
| Total Household Disbursements | | 4,884.62 | | 4,884.62 |
| Total Business Disbursements | | | | 0.00 |
| Total Disbursements | $ | 4,884.62 | $ | 4,884.62 |
| | | | | |
| Net Cash Flow (Total Reciepts minus Total Disbursements) | $ | (642.74) | $ | (642.74) |
| | | | | |
| Cash-End of Month (Individual) | $ | 1,152.30 | $ | 1,152.30 |
| Cash-End of Month (Business) | | $0.00 | | $0.00 |

### Calculation of Disbursements for United States Trustee Quarterly Fees

| | | | | |
|---|---|---|---|---|
| Total Disbursements (From Above) | $ | 4,884.62 | $ | 4,884.62 |
| Less Any Amounts Transferred or Paid from the Business account to the<br>household account(i.e., Salary Paid to Debtor or Owners Draw) | | $0.00 | | $0.00 |

| | | |
|---|---|---|
| Disbursements for U.S. Trustee Fee Calculation | | |

I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct ot the best of my knowledge and belief.

This ___/ 8___ day of ___Feb___ 20 / 0 .

_____
Debtor's Signature

## SCHEDULE OF HOUSEHOLD
### CASH RECEIPTS AND CASH DISBURSEMENTS

|  | Month | Cumulative |
|---|---|---|
| **CASH** Beginning of Month | January | Total |
|  | $ 1,795.04 | 1,795.04 |
| **CASH RECEIPTS** |  |  |
| Salary or Cash from Business | 3,493.32 | 5,288.36 |
| Wages from Other Sources (attach list) |  | 5,288.36 |
| Interest of Divident Income |  | 5,288.36 |
| Alimony or Child Support |  | 5,288.36 |
| Social security/Pension/Retirement |  | 5,288.36 |
| Sale of Household Assets (attach list) |  | 5,288.36 |
| Loans/Borrowing from Outside Sources (attach list) |  | 5,288.36 |
| Other (specify) (attach list)    Returned Check #313 | 748.56 | 6,036.92 |
|  |  |  |
| **TOTAL: RECEIPTS** | $ 4,241.88 | $ 6,036.92 |

| **CASH DISBURSEMENTS** |  |  |
|---|---|---|
| Alimony/ Child Support |  | - |
| Charitable Contributions |  | - |
| Gifts |  | - |
| Household Expenses/Food | 72.80 | 72.80 |
| Household Repairs & Maintenance | 3,575.13 | 3,647.93 |
| Insurance | 182.00 | 3,829.93 |
| IRA Contribution |  | 3,829.93 |
| Lease/ Rent Payments |  | 3,829.93 |
| Medical/ Dental payments |  | 3,829.93 |
| Mortgage Payment(s) |  | 3,829.93 |
| Other Secured Payments |  | 3,829.93 |
| Taxes-Real Estate |  | 3,829.93 |
| Taxes Other (attach schedule) |  | 3,829.93 |
| Travel & Entertainment | 12.00 | 3,841.93 |
| Tuition/Education |  | 3,841.93 |
| Utilities (Electric, Gas, Water,Cable, Sanitation) | 1,007.69 | 4,849.62 |
| Vehicle Expenses |  | 4,849.62 |
| Vechile Secured Payment(s) |  | 4,849.62 |
| U.S. Trustee Quarterly Fees |  | 4,849.62 |
| Professional Fees Legal,Accounting) |  | 4,849.62 |
| Other (attach schedule)    Overdraft Fee | 35.00 | 4,884.62 |
| Loan to Dr. Peter G Ballas II, M.D. P.A |  |  |
|  |  |  |
| TOTAL HOUSEHOLD DISBURSEMENTS | $ 4,884.62 | $ 4,884.62 |

| CASH-End of Month (Must Equal reconciled bank statement Attachment No. 2) | $ 1,152.30 | $ 1,152.30 |
|---|---|---|

MONTHLY OPERATING REPORT-
INDIVIDUAL

ATTACHMENT NO.2

BANK ACCOUNT RECONCILIATIONS          1/31/2010

| Bank account Information | Account #1 | Account #2 | Account #3 | Account #4 |
|---|---|---|---|---|
| Name of Bank: | TD Bank | | | |
| Account Number: | | | | |
| Purpose of account (Business/Personal) | Personal | | | |
| Type of account (e.g. checking) | Checking | | | |
| | | | | |
| 1. Balance per Bank Statement | $    1,152.30 | | | |
| 2. ADD: Deposits not credited (attach list to this report) | | | | |
| 3. SUBTRACT: Outstanding Checks (attach list) | | | | |
| 4. Other Reconciling items (attach list to this report) | | | | |
| 5. Month End Balance (Must Agree with books) | $    1,152.30 | | | |
| TOTAL OF ALL ACCOUNTS | | | | $    1,152.30 |

Note: Attach a copy of the bank statement and bank reconciliation for each account.

| Investment Account Information Bank / Account Name / Number | Date of Purchase | Type of Instrument | Purchase Price | Current Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Note: Attach a copy of each nvestment account statement.

## CASH DISBURSEMENTS DETAILS-HOUSEHOLD

| Name of Bank | | TD BANK | | |
|---|---|---|---|---|
| Account Number | | 6860835468 | **January-10** | |
| Purpose of | | PERSONAL | | |
| Type of account | | Checking | | |

| Check Number | Date of Check | Payee | Purpose | Amount | |
|---|---|---|---|---|---|
| 219 | 1/1/2010 | Rommell Pueblo | House Maintenance | $ | 100.00 |
| 220 | 1/9/2010 | Bond Street | Personal Household | $ | 36.00 |
| 221 | 1/25/2010 | Rommell Pueblo | House Maintenance | $ | 80.00 |
| 301 | 1/1/2010 | Empire Home Management | House Maintenance | $ | 460.00 |
| 302 | 1/1/2010 | Empire Home Management | House Maintenance | $ | 493.75 |
| 312 | 1/1/2010 | Nationwide | Insurance | $ | 91.00 |
| 313 | 1/1/2010 | Empire Home Management | House Maintenance *(Returne )(us F)* | $ | 748.56 |
| 314 | 1/15/2010 | Empire Home Management | House Maintenance | $ | 1,642.82 |
| 315 | 1/15/2010 | Empire Home Management | House Maintenance | $ | 50.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **ACH Debits** | | | | | |
| | 1/4/2010 | Terrace Restaurant | Meals, Household | $ | 36.80 |
| | 1/5/2010 | Nationwide Ins. | Insurance | $ | 91.00 |
| | 1/11/2010 | Questar Gas | Utilities | $ | 557.69 |
| | 1/19/2010 | Reservation Rewards | Bank Fees | $ | 12.00 |
| | 1/13/2010 | TD Bank | Overdraft Fees | $ | 35.00 |
| | 1/20/2010 | FPL | Utilities | $ | 450.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | **TOTAL** | $ | 4,884.62 |

If any checks written this period have not been delivered to the payee, provide details, Including the payee, amount, explanation for
holding check and anticipated delivery date of check.


**Bank**
America's Most Convenient Bank®



I

**STATEMENT OF ACCOUNT**

683638 06DD1M33 1 000010
PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA
1905 CLINT MOORE #215
BOCA RATON FL 33496

Page:                                    1 of  6
Statement Period: Dec 01 2009-Dec 31 2009
Cust Ref #:
Primary Account #:

## Chapter 11 Checking

PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA



## KEEPING YOU INFORMED

EARLIER THIS YEAR WE COMMUNICATED TO YOU THAT WE WOULD BE CHANGING THE ORDER IN
WHICH WE POST YOUR DAILY TRANSACTIONS TO YOUR ACCOUNT. THIS CHANGE WILL NOT BE
GOING INTO EFFECT AT THIS TIME. INSTEAD, WE WILL CONTINUE TO USE OUR CURRENT
METHOD OF POSTING CREDITS FIRST, FOLLOWED BY DEBITS, WITH DEBITS SORTED FROM
LARGEST TO SMALLEST. OUR POSTING ORDER MAY CHANGE IN THE FUTURE.

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---:|
| Statement Balance as of 12/01 | | | 1,712.02 |
| Plus | 7 | Deposits and Other Credits | 5,377.20 |
| Less | 33 | Checks and Other Debits | 5,294.18 |
| Statement Balance as of 12/31 | | | 1,795.04 |

### ACCOUNT ACTIVITY

**Transactions by Date**

| DATE | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|---|---|---:|---:|---:|
| 12/1 | DEPOSIT | | 600.00 | 2,312.02 |
| 12/1 | DEBIT CARD PURCHASE<br>VISA DDA PUR          ***<br>CAREY INTL INC LIMOS      8003364646    *MD | 154.66 | | 2,157.36 |
| 12/2 | Check #287 | 776.87 | | 1,380.49 |
| 12/2 | ACH DEBIT<br>NATIONWIDE P&C  NW INTREFT ****979450 | 81.00 | | 1,299.49 |
| 12/2 | Check #292 | 17.25 | | 1,282.24 |
| 12/3 | Check #296 | 42.90 | | 1,239.34 |
| 12/4 | ACH DEPOSIT<br>PETER G BALLAS I DIRECT DEP *** | | 1,197.10 | 2,436.44 |
| 12/4 | ELECTRONIC CK PMT-ARC 291<br>STATE FARM RO 08 PYMT    291 | 220.58 | | 2,215.86 |
| 12/4 | Check #288 | 186.69 | | 2,029.17 |
| 12/4 | ELECTRONIC CK PMT-ARC 294<br>DIRECTV INC    CHECKPYMT 0294 | 128.66 | | 1,900.51 |
| 12/4 | ELECTRONIC CK PMT-ARC 295<br>Rocky Mtn Power  Payment  0295 | 90.57 | | 1,809.94 |
| 12/4 | Check #290 | 75.08 | | 1,734.86 |
| 12/7 | ELECTRONIC CK PMT-ARC 298<br>BMW Fin Svc    CHECK PYMT 0298 | 597.58 | | 1,137.28 |

Call 1-800-YES-2000 for 24-hour Direct Banking service



683638 06DD1M33 012825


STATEMENT OF ACCOUNT

PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA

Page:                          3 of  6
Statement Period: Dec 01 2009-Dec 31 2009
Cust Ref #:
Primary Account #:

## ACCOUNT ACTIVITY

### Transactions by Date (continued)

| DATE | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------|--------|---------|
| 12/7 | Check #297 | 48.20 | | 1,089.08 |
| 12/7 | Check #289 | 37.40 | | 1,051.68 |
| 12/7 | ELECTRONIC CK PMT-ARC 293 | 7.46 | | 1,044.22 |
| | AMERIGAS PROPANE CHECKPYMT 0293 | | | |
| 12/9 | ELECTRONIC PMT-TEL | 544.10 | | 500.12 |
| | FPL DIRECT DEBIT ELEC PYMT ****064265 TELV | | | |
| 12/10 | ACH DEBIT | 212.56 | | 287.56 |
| | Questar Gas Co. QGC      ****11100081711 | | | |
| 12/11 | DEPOSIT | | 600.00 | 887.56 |
| 12/11 | Check #299 | 250.00 | | 637.56 |
| 12/14 | Check #213 | 190.00 | | 447.56 |
| 12/15 | DEPOSIT | | 600.00 | 1,047.56 |
| 12/15 | ELECTRONIC CK PMT-ARC 300 | 401.46 | | 646.10 |
| | STATE FARM RO 27 PYMT    300 | | | |
| 12/15 | Check #217 | 150.00 | | 496.10 |
| 12/15 | Check #218 | 36.00 | | 460.10 |
| 12/16 | HANDLING CHARGE | 70.00 | | 390.10 |
| | OVERDRAFT PD | | | |
| 12/16 | DEBIT CARD PURCHASE | 12.00 | | 378.10 |
| | VISA DDA PUR         *** | | | |
| | RESERVATION REWARDS     800 7327031 *CT | | | |
| 12/17 | DEPOSIT | | 1,197.10 | 1,575.20 |
| 12/22 | DEBIT CARD PURCHASE | 142.00 | | 1,433.20 |
| | VISA DDA PUR         ** | | | |
| | GUMP S DIRECT | | | |
| 12/22 | DEBIT CARD PURCHASE | 61.17 | | 1,372.03 |
| | VISA DDA PUR         ** | | | |
| | BROOKSTONE 20300702035            H | | | |
| 12/23 | DEPOSIT | | 500.00 | 1,872.03 |
| 12/28 | DEBIT CARD PURCHASE | 54.32 | | 1,817.71 |
| | VISA DDA PUR         *** | | | |
| | MAVERIK CNTRY STRE 317   PARK CITY   *UT | | | |
| 12/29 | DEPOSIT | | 683.00 | 2,500.71 |
| 12/29 | Check #308 | 189.33 | | 2,311.38 |
| 12/29 | Check #305 | 83.55 | | 2,227.83 |
| 12/29 | Check #304 | 75.07 | | 2,152.76 |
| 12/30 | Check #309 | 165.77 | | 1,986.99 |
| 12/30 | Check #307 | 74.80 | | 1,912.19 |
| 12/30 | ELECTRONIC CK PMT-ARC 311 | 38.94 | | 1,873.25 |
| | AMERIGAS PROPANE CHECKPYMT 0311 | | | |

Call 1-800-YES-2000 for 24-hour Direct Banking service



663638 06DD1M33 012828

**Bank**
America's Most Convenient Bank®

STATEMENT OF ACCOUNT

I

PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA

Page: 5 of 6
Statement Period: Dec 01 2009–Dec 31 2009
Cust Ref #:
Primary Account #:

---

#213    12/14    $190.00

#217    12/15    $150.00

#218    12/15    $36.00

#287    12/02    $776.87

#288    12/04    $186.69

#289    12/07    $37.40

#290    12/04    $75.08

#292    12/02    $17.25

#296    12/03    $42.90

#297    12/07    $48.20

**Bank**
America's Most Convenient Bank®

STATEMENT OF ACCOUNT

PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA

Page:                    4 of  6
Statement Period: Dec 01 2009-Dec 31 2009
Cust Ref #:
Primary Account #:

## ACCOUNT ACTIVITY

**Transactions by Date (continued)**

| DATE | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------|--------|---------|
| 12/31 | Check #310 | 78.21 | | 1,795.04 |

**Checks Paid**   No. Checks: 17   *Indicates break in serial sequence or check processed electronically and listed under Electronic Payments

| DATE | SERIAL NO. | AMOUNT | | DATE | SERIAL NO. | AMOUNT |
|------|-----------|--------|--|------|-----------|--------|
| 12/14 | 213 | 190.00 | | 12/7 | 297 | 48.20 |
| 12/15 | 217* | 150.00 | | 12/11 | 299* | 250.00 |
| 12/15 | 218 | 36.00 | | 12/29 | 304* | 75.07 |
| 12/2 | 287* | 776.87 | | 12/29 | 305 | 83.55 |
| 12/4 | 288 | 186.69 | | 12/30 | 307* | 74.80 |
| 12/7 | 289 | 37.40 | | 12/29 | 308 | 189.33 |
| 12/4 | 290 | 75.08 | | 12/30 | 309 | 165.77 |
| 12/2 | 292* | 17.25 | | 12/31 | 310 | 78.21 |
| 12/3 | 296* | 42.90 | | | | |

Call 1-800-YES-2000 for 24-hour Direct Banking service

BANK DEPOSITS FDIC INSURED    ©    WWW.TDBANK.COM

I

**STATEMENT OF ACCOUNT**

PETER G BALLAS II MD
DIP CASE # 09-12545-EPK
DISTRICT OF SOUTHERN FLORIDA

Page: 6 of 6
Statement Period: Dec 01 2009-Dec 31 2009
Cust Ref #:
Primary Account #:



#299    12/11    $250.00



#305    12/29    $83.55



#308    12/29    $189.33



#310    12/31    $78.21



#304    12/29    $75.07



#307    12/30    $74.80



#309    12/30    $165.77

# Southern District of Florida
# Claims Register

09-12545-EPK Peter G. Ballas

**Judge:** Erik P. Kimball    **Chapter:** 11

**Office:** West Palm Beach    **Last Date to file claims:** 06/25/2009

**Trustee:**    **Last Date to file (Govt):** 08/12/2009

| *Creditor:* (86819597)<br>KEYBANK<br>POB 94968<br>CLEVELAND, OH 44101 | **Claim No: 1**<br>*Original Filed*<br>*Date:* 03/04/2009<br>*Original Entered*<br>*Date:* 03/04/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Day, Jr, John<br>*Modified:* |
|---|---|---|

Unsecured claimed: $92762.83

**Total** **claimed: $92762.83**

*History:*

Details 1-1 03/04/2009 Claim #1 filed by KEYBANK, total amount claimed: $92762.83 (Day, Jr, John )

*Description:*

*Remarks:*

| *Creditor:* (86827926)<br>FIA CARD SERVICES, NA/BANK OF<br>AMERICA<br>BY AMERICAN INFOSOURCE LP AS ITS<br>AGENT<br>PO Box 248809<br>Oklahoma City, OK 73124-8809 | **Claim No: 2**<br>*Original Filed*<br>*Date:* 03/09/2009<br>*Original Entered*<br>*Date:* 03/09/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* American InfoSource (Hogan),<br>*Modified:* |
|---|---|---|

Unsecured claimed: $76627.63

**Total** **claimed: $76627.63**

*History:*

Details 2-1 03/09/2009 Claim #2 filed by FIA CARD SERVICES, NA/BANK OF AMERICA, total amount claimed:
$76627.63 (American InfoSource (Hogan))

*Description:*

*Remarks:*

| *Creditor:* (86845928)<br>Wells Fargo Bank, N.A.<br>P. O. Box 14469 MAC X2303-01M<br>Des Moines, IA 50306-9655 | **Claim No: 3**<br>*Original Filed*<br>*Date:* 03/19/2009<br>*Original Entered*<br>*Date:* 03/19/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* aWells Fargo Bank (Thor),<br>*Modified:* |
|---|---|---|

Secured claimed: $94268.54

**Total** **claimed: $94268.54**

*History:*

EXHIBIT

D

Details   3-1 03/19/2009 Claim #3 filed by Wells Fargo Bank, N.A., total amount claimed: $94268.54 (aWells Fargo
          Bank (Thor))

*Description:*

*Remarks:*

| *Creditor:* (86833233)<br>American Express Bank FSB<br>c/o Becket and Lee LLP<br>POB 3001<br>Malvern PA 19355-0701 | **Claim No: 4**<br>*Original Filed*<br>*Date:* 03/20/2009<br>*Original Entered*<br>*Date:* 03/20/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* ^Becket and Lee LLP4,<br>*Modified:* |
|---|---|---|

Unsecured claimed: $32292.30

**Total      claimed: $32292.30**

*History:*

Details   4-1 03/20/2009 Claim #4 filed by American Express Bank FSB, total amount claimed: $32292.3 (^Becket and
          Lee LLP4)

*Description:*

*Remarks:*

| *Creditor:* (86852964)<br>Toyota Motor Credit Corporation<br>500 Redbrook Blvd.<br>Owings Mills, MD 21117 | **Claim No: 5**<br>*Original Filed*<br>*Date:* 03/23/2009<br>*Original Entered*<br>*Date:* 03/23/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Toyota Motor Credit Corp<br>(Martinson),<br>*Modified:* |
|---|---|---|

Unsecured claimed: $31113.64

**Total      claimed: $31113.64**

*History:*

Details   5-1 03/23/2009 Claim #5 filed by Toyota Motor Credit Corporation, total amount claimed: $31113.64 (Toyota
          Motor Credit Corp (Martinson))

*Description:*

*Remarks:*

| *Creditor:* (86868209)<br>Wells Fargo Bank, N.A.<br>P. O. Box 14469 MAC X2303-01A<br>Des Moines, IA 50306-9655 | **Claim No: 6**<br>*Original Filed*<br>*Date:* 03/26/2009<br>*Original Entered*<br>*Date:* 03/26/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Wells Fargo Bank (Uhlenhopp),<br>*Modified:* |
|---|---|---|

Secured claimed: $1121054.70

**Total      claimed: $1121054.70**

*History:*

Details   6-1 03/26/2009 Claim #6 filed by Wells Fargo Bank, N.A., total amount claimed: $1121054.7 (Wells Fargo
          Bank (Uhlenhopp))

*Description:*

*Remarks:*

| *Creditor:* (86782076)<br>Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA 19114 | **Claim No: 7**<br>*Original Filed*<br>*Date:* 04/10/2009<br>*Original Entered*<br>*Date:* 04/10/2009<br>*Last Amendment*<br>*Filed:* 10/09/2009<br>*Last Amendment*<br>*Entered:* 10/09/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* IRS (Everett),<br>*Modified:* |
|---|---|---|

Unsecured claimed: $50147.85

Secured     claimed:        $0.00

Priority     claimed: $152203.03

**Total**      **claimed: $202350.88**

*History:*

Details     7-1 04/10/2009 Claim #7 filed by Internal Revenue Service, total amount claimed: $400000 (IRS (Everett))

Details     7-2 10/09/2009 Amended Claim #7 filed by Internal Revenue Service, total amount claimed: $202350.88 (IRS
(Everett))

*Description:*

*Remarks:*

| *Creditor:* (86833233)<br>American Express Bank FSB<br>c/o Becket and Lee LLP<br>POB 3001<br>Malvern PA 19355-0701 | **Claim No: 8**<br>*Original Filed*<br>*Date:* 04/15/2009<br>*Original Entered*<br>*Date:* 04/15/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Becket and Lee LLP,<br>*Modified:* |
|---|---|---|

Unsecured claimed: $1709.38

**Total**      **claimed: $1709.38**

*History:*

Details     8-1 04/15/2009 Claim #8 filed by American Express Bank FSB, total amount claimed: $1709.38 (Becket and
Lee LLP)

*Description:*

*Remarks:*

| *Creditor:* (86833233)<br>American Express Bank FSB<br>c/o Becket and Lee LLP<br>POB 3001<br>Malvern PA 19355-0701 | **Claim No: 9**<br>*Original Filed*<br>*Date:* 04/15/2009<br>*Original Entered*<br>*Date:* 04/15/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Becket and Lee LLP,<br>*Modified:* |
|---|---|---|

Unsecured claimed: $8197.81

**Total**      **claimed: $8197.81**

*History:*

Details     9-1 04/15/2009 Claim #9 filed by American Express Bank FSB, total amount claimed: $8197.81 (Becket and

| Lee LLP) | | |
|---|---|---|
| *Description:* | . | |
| *Remarks:* | | |

| *Creditor:* (86973927)<br>Besse Medical<br>Jim Maxwell<br>c/o Royal Mercantile Trust<br>Ten Central Parkway #200<br>Stuart FL 34994 | **Claim No: 10**<br>*Original Filed*<br>*Date:* 05/05/2009<br>*Original Entered*<br>*Date:* 05/06/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Grooms, Desiree<br>*Modified:* |
|---|---|---|

Unsecured claimed: $14065.05

**Total**     **claimed: $14065.05**

*History:*

Details   10-1  05/05/2009 Claim #10 filed by Besse Medical, total amount claimed: $14065.05 (Grooms, Desiree )

| *Description:* |
|---|
| *Remarks:* |

| *Creditor:* (86991962)<br>Palm Beach County Tax Collector<br>P.O. Box 3715<br>West Palm Beach, Fl 33402-3715 | **Claim No: 11**<br>*Original Filed*<br>*Date:* 05/14/2009<br>*Original Entered*<br>*Date:* 05/14/2009 | *Status:*<br>*Filed by:* AT<br>*Entered by:* Suarez-Murias, Marta<br>*Modified:* |
|---|---|---|

Secured claimed: $3573.18

**Total**     **claimed: $3573.18**

*History:*

Details   11-1  05/14/2009 Claim #11 filed by Palm Beach County Tax Collector, total amount claimed: $3573.18
                  (Suarez-Murias, Marta )

| *Description:* |
|---|
| *Remarks:* |

| *Creditor:* (86991962)<br>Palm Beach County Tax Collector<br>P.O. Box 3715<br>West Palm Beach, Fl 33402-3715 | **Claim No: 12**<br>*Original Filed*<br>*Date:* 05/14/2009<br>*Original Entered*<br>*Date:* 05/14/2009 | *Status:*<br>*Filed by:* AT<br>*Entered by:* Suarez-Murias, Marta<br>*Modified:* |
|---|---|---|

Secured claimed: $3469.20

**Total**     **claimed: $3469.20**

*History:*

Details   12-1  05/14/2009 Claim #12 filed by Palm Beach County Tax Collector, total amount claimed: $3469.2 (Suarez-
                  Murias, Marta )

| *Description:* |
|---|
| *Remarks:* |

| Creditor: (86868209)<br>Wells Fargo Bank, N.A.<br>P. O. Box 14469 MAC X2303-01A<br>Des Moines, IA 50306-9655 | Claim No: 13<br>Original Filed<br>Date: 05/21/2009<br>Original Entered<br>Date: 05/21/2009 | Status:<br>Filed by: CR<br>Entered by: Wells Fargo Bank (Uhlenhopp),<br>Modified: |
|---|---|---|

Secured claimed: $280304.92

**Total** **claimed: $280304.92**

History:

Details 13-1 05/21/2009 Claim #13 filed by Wells Fargo Bank, N.A., total amount claimed: $280304.92 (Wells Fargo Bank (Uhlenhopp))

Description:

Remarks:

| Creditor: (87057112)<br>eCAST Settlement Corp<br>Assignee of HSBC Bank Nevada<br>Bass & Associates, P.C.<br>3936 E. Ft. Lowell Rd., Suite 200<br>Tucson, AZ 85712 | Claim No: 14<br>Original Filed<br>Date: 06/09/2009<br>Original Entered<br>Date: 06/09/2009 | Status:<br>Filed by: CR<br>Entered by: Bass & Associates (Segura),<br>Modified: |
|---|---|---|

Unsecured claimed: $15702.43

**Total** **claimed: $15702.43**

History:

Details 14-1 06/09/2009 Claim #14 filed by eCAST Settlement Corp, total amount claimed: $15702.43 (Bass & Associates (Segura))

Description:

Remarks:

| Creditor: (86782084) History<br>National City<br>PO Box 94982<br>Cleveland OH 44101 | Claim No: 15<br>Original Filed<br>Date: 06/01/2009<br>Original Entered<br>Date: 06/09/2009 | Status:<br>Filed by: CR<br>Entered by: Grooms, Desiree<br>Modified: |
|---|---|---|

Unsecured claimed: $11654.67

**Total** **claimed: $11654.67**

History:

Details 15-1 06/01/2009 Claim #15 filed by National City, total amount claimed: $11654.67 (Grooms, Desiree )

Description:

Remarks:

| Creditor: (86782084) History<br>National City<br>PO Box 94982<br>Cleveland OH 44101 | Claim No: 16<br>Original Filed<br>Date: 06/12/2009<br>Original Entered<br>Date: 06/16/2009 | Status:<br>Filed by: CR<br>Entered by: Grooms, Desiree<br>Modified: |
|---|---|---|

Unsecured claimed: $11654.67

**Total    claimed: $11654.67**

*History:*

Details  16-1 06/12/2009 Claim #16 filed by National City, total amount claimed: $11654.67 (Grooms, Desiree )

*Description:*

*Remarks:*

| *Creditor:*        (87092900)<br>GE Money Bank<br>Care of Recovery Management Systems<br>Corp<br>dba CHEVRON TEXACO PLCC<br>25 SE 2nd Ave Ste 1120<br>Miami FL 33131 | **Claim No: 17**<br>*Original Filed*<br>*Date:* 06/22/2009<br>*Original Entered*<br>*Date:* 06/22/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Recovery Management Systems<br>Corp,<br>*Modified:* |
|---|---|---|

Unsecured claimed: $1540.19

**Total    claimed: $1540.19**

*History:*

Details  17-1 06/22/2009 Claim #17 filed by GE Money Bank, total amount claimed: $1540.19 (Recovery Management
              Systems Corp)

*Description:*

*Remarks:*

| *Creditor:*        (87096058)<br>KeyBank National Association<br>c/o David A. Ray, Esq.<br>Arnstein & Lehr, LLP<br>200 East Las Olas Blvd., Suite 1700<br>Ft. Lauderdale, FL 33301 | **Claim No: 18**<br>*Original Filed*<br>*Date:* 06/23/2009<br>*Original Entered*<br>*Date:* 06/23/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Ray, David<br>*Modified:* |
|---|---|---|

Unsecured claimed: $10470.11

**Total    claimed: $10470.11**

*History:*

Details  18-1 06/23/2009 Claim #18 filed by KeyBank National Association, total amount claimed: $10470.11 (Ray,
              David )

*Description:*

*Remarks:*

| *Creditor:*        (86782090)<br>Shumaker, Loop & Kendrick LLP<br>1000 Jackson Street<br>Toledo, OH 43604-5573 | **Claim No: 19**<br>*Original Filed*<br>*Date:* 06/24/2009<br>*Original Entered*<br>*Date:* 06/24/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Traub, Seth<br>*Modified:* |
|---|---|---|

Secured claimed: $22500.00

**Total    claimed: $22500.00**

*History:*

| Details | 19-1 06/24/2009 Claim #19 filed by Shumaker, Loop & Kendrick LLP, total amount claimed: $22500 (Traub, Seth ) |

*Description:* (19-1) pre-petition legal services performed

*Remarks:*

| *Creditor:* (87106585)<br>Wells Fargo Bank, N.A.<br>Bankruptcy Department<br>3476 Stateview Blvd X7801-014<br>Ft. Mill, SC 29715 | **Claim No: 20**<br>*Original Filed*<br>*Date:* 06/25/2009<br>*Original Entered*<br>*Date:* 06/25/2009 | *Status:*<br>*Filed by:* AT<br>*Entered by:* Sawyer, Melissa<br>*Modified:* |

Secured claimed: $1265992.27

**Total** **claimed: $1265992.27**

*History:*

Details    20-1 06/25/2009 Claim #20 filed by Wells Fargo Bank, N.A., total amount claimed: $1265992.27 (Sawyer, Melissa )

*Description:* (20-1) The arrearage amount is $51,854.11

*Remarks:* (20-1) Please forward all payments to Wells Fargo Bank, N.A., Bankruptcy Department, One Home Campus, Attn: Bkcy Payment Processing, MAC# x2302-04C, Des Moines, IA 50328

| *Creditor:* (87106606)<br>Wells Fargo Bank, N.A.<br>Bankruptcy Department<br>3476 Stateview Blvd X7801-014<br>Ft. Mill, SC 29715 | **Claim No: 21**<br>*Original Filed*<br>*Date:* 06/25/2009<br>*Original Entered*<br>*Date:* 06/25/2009 | *Status:*<br>*Filed by:* AT<br>*Entered by:* Sawyer, Melissa<br>*Modified:* |

Secured claimed: $1040820.03

**Total** **claimed: $1040820.03**

*History:*

Details    21-1 06/25/2009 Claim #21 filed by Wells Fargo Bank, N.A., total amount claimed: $1040820.03 (Sawyer, Melissa )

*Description:* (21-1) The arrearage amount is $46,993.91

*Remarks:* (21-1) Please forward all payments to Wells Fargo Bank, N.A., Bankruptcy Department, One Home Campus, Attn: Bkcy Payment Processing, MAC# x2302-04C, Des Moines, IA 50328

| *Creditor:* (87106607)<br>Wells Fargo Bank, N.A.<br>Bankruptcy Department<br>3476 Stateview Blvd X7801-014<br>Ft. Mill, SC 29715 | **Claim No: 22**<br>*Original Filed*<br>*Date:* 06/25/2009<br>*Original Entered*<br>*Date:* 06/25/2009 | *Status:*<br>*Filed by:* AT<br>*Entered by:* Blanco, Alice<br>*Modified:* |

Secured claimed: $699730.35

**Total** **claimed: $699730.35**

*History:*

Details    22-1 06/25/2009 Claim #22 filed by Wells Fargo Bank, N.A., total amount claimed: $699730.35 (Blanco, Alice )

| *Description:* (22-1) The arrearage amount is $14,299.44 |
| --- |

| *Remarks:* (22-1) Please forward all payments to Wells Fargo Bank, N.A., Bankruptcy Department, One Home Campus, Attn: Bkcy Payment Processing, MAC# x2302-04C, Des Moines, IA 50328 |
| --- |

| *Creditor:* (86782083)<br>Matina A. Nimphie<br>1023 Coralina Way<br>Delray Beach, FL 33483 | **Claim No: 23**<br>*Original Filed*<br>*Date*: 06/24/2009<br>*Original Entered*<br>*Date*: 06/29/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Grooms, Desiree<br>*Modified:* |
| --- | --- | --- |

Unsecured claimed: $163208.62

**Total      claimed: $163208.62**

| *History:* |
| --- |
| Details   23-1  06/24/2009 Claim #23 filed by Matina A. Nimphie, total amount claimed: $163208.62 (Grooms, Desiree ) |
| *Description:* |
| *Remarks:* |

| *Creditor:* (86782083)<br>Matina A. Nimphie<br>1023 Coralina Way<br>Delray Beach, FL 33483 | **Claim No: 24**<br>*Original Filed*<br>*Date*: 06/24/2009<br>*Original Entered*<br>*Date*: 06/29/2009 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Grooms, Desiree<br>*Modified:* |
| --- | --- | --- |

Unsecured claimed: $22500.00

**Total      claimed: $22500.00**

| *History:* |
| --- |
| Details   24-1  06/24/2009 Claim #24 filed by Matina A. Nimphie, total amount claimed: $22500 (Grooms, Desiree ) |
| *Description:* |
| *Remarks:* |

## Claims Register Summary

**Case Name:** Peter G. Ballas
**Case Number:** 09-12545-EPK
**Chapter:** 11
**Date Filed:** 02/13/2009
**Total Number Of Claims:** 24

|  | **Total Amount Claimed** | **Total Amount Allowed** |
| --- | --- | --- |
| **Unsecured** | $543647.18 | |
| **Secured** | $4531713.19 | |
| **Priority** | $152203.03 | |
| **Unknown** | | |
| **Administrative** | | |
| **Total** | **$5227563.40** | **$0.00** |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/25/2009 23:30:13 | | | |
| **PACER Login:** | re0740 | **Client Code:** | ballas |
| **Description:** | Claims Register | **Search Criteria:** | 09-12545-EPK Filed or Entered From: 1/1/1990 Filed or Entered To: 10/26/2009 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

**Peter G. Ballas II MD**

**STATEMENT OF ASSETS**

| | Book Values as of 30-Sep-09 | % Recovery | Estimated Liquidation Value |
|---|---|---|---|
| Cash and Cash Equivalents | $ 814 | 100% | $ 814 |
| Merchandise Inventories | - | | - |
| Other Current Assets | - | | - |
| Land and Buildings (Note 1) | 6,005,000 | - | 6,005,000 |
| Personal Property | 100,000 | - | 100,000 |
| **Total Assets** | $ 6,105,814 | | $ 6,105,814 |
| Cost Associated with Liquidation: | | | |
| Commission and Closing Costs (Note 1) | | | (390,800) |
| Trustee Fees | | | (20,000) |
| | | | (410,800) |
| Net Estimated Liquidation Proceeds Available for Allocation | | | $ 5,695,014 |

EXHIBIT
E

**Note 1**

**Peter G. Ballas II MD**

**Ballas Properties**

| | | |
|---|---|---|
| 3960 North Ocean Blvd, #1 Gulf Stream, Florida | $ | 1,525,000 |
| 49 Silver Dollar Drive, Park City Utah | | 3,380,000 |
| 159 East Walton Place #12D, Chicago, Illinois | | 1,100,000 |
| **Total Ballas Properties** | $ | 6,005,000 |

Schedule I

**Peter G. Ballas II MD**

**Ballas Mortgages**

| | | |
|---|---|---|
| 3960 North Ocean Blvd, #1 Gulf Stream, Florida | $ | 1,279,990 |
| 49 Silver Dollar Drive, Park City Utah | | 2,337,935 |
| 159 East Walton Place #12D, Chicago, Illinois | | 780,945 |
| **Total Ballas Mortgages** | $ | 4,398,870 |

**Liens**

| | | |
|---|---|---|
| CDS Holdings, Park City Utah | $ | 370,000 |
| Polo Ridge Condo Assoc. Inc. | | 11,000 |

**Other**

| | | |
|---|---|---|
| Key Bank Line of Credit, George P. Ballas Trust | | 10,500 |
| Key Bank Security Agreement, George P. Ballas Trust | | 187,591 |
| **Total Secured Portion of Impaired Secured Claims** | $ | 559,091 |

Schedule II

## ALLOCATION OF NET ESTIMATED LIQUIDATION PROCEEDS TO UNSECURED CLAIMANTS

| Claim Classification | | Per Proposed Plan<br>Claim<br>Amount |
|---|---|---|
| **Priority Claims** | | |
| Internal Revenue Service (Estimated) | $ | 202,351 |
| **Non Priority Claims** | | |
| Business Management Revolving Account | $ | 31,506 |
| Business Credit Cards | | 19,076 |
| Credit Cards | | 117,693 |
| Personal Guaranty of Lease | | 192,864 |
| Guaranty of Vehicle Lease | | 30,298 |
| Legal Services | | 151,017 |
| Revolving Credit Card | | 16,002 |
| **Total** | $ | 558,456 |

## Unsecured Claims

| | | | |
|---|---|---|---|
| American Express | Business Mgt. Revolving Account | 31,506.34 | $ 31,506.34 |
| American Express | Business Credit Card | 7,750.02 | |
| American Express | Business Credit Card | 1,634.13 | |
| Regions Bank | Personal guaranty of Business credit card | 9,691.37 | 19,075.52 |
| Bank of America | Credit Card | 78,981.35 | |
| Chevron | Credit Card | 1,286.75 | |
| Citi Card | Credit Card | 23,656.85 | |
| Shell | Credit card | 2,107.10 | |
| National City | Credit Card | 11,661.22 | 117,693.27 |
| Health Capital Financial Services | Personal Guaranty of Lease | 33,178.94 | |
| Health Capital Financial Services | Personal Guaranty of Lease | 159,685.00 | 192,863.94 |
| Lexus Financial Services | Guaranty of vehicle lease | 30,298.00 | 30,298.00 |
| Shumaker, Loop & Kendrick LLP | Legal Services | 4,359.00 | |
| Shumaker, Loop & Kendrick LLP | Legal Services | 146,657.96 | 151,016.96 |
| Saks Fifth Avenue | Revolving credit card | 16,001.94 | 16,001.94 |
| Total Unsecured Claims | | | $ 558,455.97 |

Peter G. Ballas II MD

## NET ESTIMATED LIQUIDATION PROCEEDS AFTER ALLOCATIONS TO SECURED, ADMINISTRATIVE AND PRIORITY TAX CLAIMANTS

| | Estimated Allowable Claims | Estimated Liquidation Value (Unaudited) |
|---|---|---|
| Net Estimated Liquidation Proceeds Available for Allocation | | $ 5,695,014 |
| Less Secured Claims: | | |
| Mortgages (Schedule I Attached) | 4,398,870 | |
| Secured Portion of Impaired Secured Claims (Schedule I Attached) | 559,091 | |
| Total Secured Claims | | 4,957,961 |
| Net Estimated Liquidation Proceeds after Secured Claims | | 737,053 |
| Less Other Chapter 11 Administrative Claims: | | |
| Costs to Cancel assumed Leases | - | |
| Professional Fees | 40,000 | |
| Expense Payables | - | |
| Reclamation Claims | - | |
| Other | - | |
| Total Other Chapter 11 Administrative Claims | | 40,000 |
| Net Estimated Liquidation Proceeds after Secured and Chapter 11 Administrative Claims | | 697,053 |
| Less Priority Tax Claims | | 202,351 |
| Net Estimated Liquidation Proceeds after Secured, Administrative and Priority Tax Claims | | 494,702 |
| Less Net Estimated Liquidation Proceeds to Unsecured Claimants (Schedule II Attached) | | 558,456 |
| Net Estimated Liquidation Proceeds after Secured and Unsecured, Administrative and Priority Tax Claims | | $ (63,754) |

**Peter G. Ballas II MD PA**
**Profit & Loss**

| | Forecast 2009 | % of Revenue | Forecast 2010 | % of Revenue | Forecast 2011 | % of Revenue | Forecast 2012 | % of Revenue | Forecast 2013 | % of Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $976,000 | 100.00% | $1,200,000 | 100.00% | $1,250,000 | 100.00% | $1,323,000 | 100.00% | $1,389,150 | 100.00% |
| Cost of Sales | 114,892 | 11.77% | 141,261 | 11.77% | 148,324 | 11.77% | 155,740 | 11.77% | 163,527 | 11.77% |
| Gross Margin | 861,108 | 88.23% | 1,058,739 | 88.23% | 1,111,676 | 88.23% | 1,167,260 | 88.23% | 1,225,623 | 88.23% |
| Office Expense | 174,671 | 19.29% | 196,036 | 19.29% | 218,215 | 19.29% | 229,126 | 19.29% | 240,582 | 19.29% |
| Insurance | 99,122 | 10.16% | 121,871 | 10.16% | 127,965 | 10.16% | 134,363 | 10.16% | 141,081 | 10.16% |
| Compensation Dr. Ballas | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% |
| Payroll Staff | 285,000 | 34.13% | 302,100 | 34.13% | 320,226 | 34.13% | 339,440 | 34.13% | 359,806 | 34.13% |
| Taxes | 44,799 | 4.59% | 55,081 | 4.59% | 57,835 | 4.59% | 60,727 | 4.59% | 63,763 | 4.59% |
| Telephone and Utilities | 30,654 | 3.14% | 37,690 | 3.14% | 39,574 | 3.14% | 41,553 | 3.14% | 43,631 | 3.14% |
| Net Income | $ 10,882 | 0.25% | $ 129,961 | 0.25% | $ 131,861 | 0.25% | $ 146,051 | 0.25% | 160,760 | 0.25% |

**Peter G. Ballas II MD PA**
**Profit & Loss**

| | Forecast 2009 | % of Revenue | Forecast 2010 | % of Revenue | Forecast 2011 | % of Revenue | Forecast 2012 | % of Revenue | Forecast 2013 | % of Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 976,000 | 100.00% | 1,024,800 | 100.00% | 1,076,040 | 100.00% | 1,129,842 | 100.00% | 1,186,334 | 100.00% |
| Cost of Sales | 114,892 | 11.77% | 120,637 | 11.77% | 126,669 | 11.77% | 133,002 | 11.77% | 139,652 | 11.77% |
| Gross Margin | 861,108 | 88.23% | 904,163 | 88.23% | 949,371 | 88.23% | 996,840 | 88.23% | 1,046,682 | 88.23% |
| Office Expense | 174,671 | 19.29% | 179,325 | 19.29% | 186,356 | 19.29% | 195,673 | 19.29% | 205,457 | 19.29% |
| Insurance | 99,122 | 10.16% | 104,078 | 10.16% | 109,282 | 10.16% | 114,746 | 10.16% | 120,483 | 10.16% |
| Compensation Dr. Ballas | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% | 216,000 | 16.67% |
| Payroll Staff | 285,000 | 34.13% | 302,100 | 34.13% | 320,226 | 34.13% | 339,440 | 34.13% | 359,806 | 34.13% |
| Taxes | 44,799 | 4.59% | 47,039 | 4.59% | 49,391 | 4.59% | 51,861 | 4.59% | 54,454 | 4.59% |
| Telephone and Utilities | 30,654 | 3.14% | 32,187 | 3.14% | 33,796 | 3.14% | 35,486 | 3.14% | 37,261 | 3.14% |
| Net Income | 10,862 | 0.25% | 23,434 | 0.25% | 34,320 | 0.25% | 43,634 | 0.25% | 53,221 | 0.25% |

**Peter G. Ballas II MD PA**
**Profit & Loss**

| | Forecast 2009 | Forecast 2010 | Forecast 2011 | Forecast 2012 | Forecast 2013 |
|---|---|---|---|---|---|
| Monthly Rent | | | | | |
| Rent | 81,579.00 | 81,579.00 | 83,722.05 | 87,908.16 | 92,303.56 |
| Building Repairs | 91.11 | 95.67 | 100.45 | 105.48 | 110.75 |
| Cleaning | 5,263.95 | 5,527.15 | 5,803.51 | 6,093.68 | 6,398.36 |
| Computer Repairs | 53.09 | 55.75 | 58.54 | 61.46 | 64.54 |
| Equipment Repairs | 595.10 | 624.85 | 656.09 | 688.90 | 723.34 |
| Pest Control | 361.19 | 379.25 | 398.21 | 418.12 | 439.03 |
| Repairs/Maintenance-Other | 12,362.37 | 12,980.49 | 13,629.52 | 14,310.99 | 15,026.54 |
| Security | 852.16 | 894.77 | 939.51 | 986.48 | 1,035.81 |
| Storage | 1,389.68 | 1,459.16 | 1,532.12 | 1,608.72 | 1,689.16 |
| **Total Office Expense** | 174,670.71 | 179,325.30 | 186,355.66 | 195,673.45 | 205,457.12 |
| **Insurance** | | | | | |
| Cafeteria Plan | 10,059.37 | 10,562.33 | 11,090.45 | 11,644.97 | 12,227.22 |
| Disability Insurance | 4,925.94 | 5,172.24 | 5,430.85 | 5,702.40 | 5,987.52 |
| Health Insurance | 49,684.55 | 52,168.78 | 54,777.22 | 57,516.08 | 60,391.88 |
| Liability Insurance | 1,013.87 | 1,064.56 | 1,117.79 | 1,173.68 | 1,232.36 |
| Malpractice Insurance | 18,044.09 | 18,946.29 | 19,893.60 | 20,888.28 | 21,932.70 |
| Officer's Health Ins. | 548.82 | 576.26 | 605.08 | 635.33 | 667.10 |
| Officer's Life Insurance. | 4,465.10 | 4,688.36 | 4,922.77 | 5,168.91 | 5,427.36 |
| Property Insurance | 4,787.12 | 5,026.48 | 5,277.80 | 5,541.69 | 5,818.78 |
| Work Comp | 2,868.62 | 3,012.05 | 3,162.65 | 3,320.78 | 3,486.82 |
| Insurance - Other | 2,724.43 | 2,860.65 | 3,003.68 | 3,153.87 | 3,311.56 |
| **Total Insurance** | 99,121.90 | 104,078.00 | 109,281.90 | 114,745.99 | 120,483.29 |
| **Payroll** | | | | | |
| Compensation Dr. Ballas | 216,000.00 | 216,000.00 | 216,000.00 | 216,000.00 | 216,000.00 |
| Wages Staff | 285,000.00 | 302,100.00 | 320,226.00 | 339,439.56 | 359,805.93 |
| **Total Payroll** | 501,000.00 | 518,100.00 | 536,226.00 | 555,439.56 | 575,805.93 |
| **Taxes** | | | | | |
| Sales Tax Expense | 475.35 | 499.12 | 524.07 | 550.28 | 577.79 |
| Payroll Taxes | 49,000.00 | 41,272.01 | 43,335.61 | 45,502.39 | 47,777.51 |

**Peter G. Ballas II MD PA**
**Profit & Loss**

|  | Forecast 2009 | Forecast 2010 | Forecast 2011 | Forecast 2012 | Forecast 2013 |
|---|---|---|---|---|---|
| Tangible Personal Property Tax | 5,017.28 | 5,268.15 | 5,531.55 | 5,808.13 | 6,098.54 |
| **Total Taxes** | **44,799.31** | **47,039.28** | **49,391.24** | **51,860.80** | **54,453.84** |
| **Telephone & Utilities** |  |  |  |  |  |
| Telephone | 23,463.14 | 24,636.30 | 25,868.12 | 27,161.52 | 28,519.60 |
| Utilities | 7,191.14 | 7,550.70 | 7,928.23 | 8,324.65 | 8,740.88 |
| **Total Telephone & Utilities** | **30,654.28** | **32,187.00** | **33,796.35** | **35,486.17** | **37,260.47** |
| **Total Expenses** | **850,246.21** | **880,729.57** | **915,051.15** | **953,205.97** | **993,460.66** |
| **Net Income** | **10,861.55** | **23,433.58** | **34,320.16** | **43,633.90** | **53,221.20** |